**GTE SERVICE CORPORATION, et al., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**NorthPoint Communications, Inc., et al., Intervenors.**

**Nos. 99–1176, 99–1201.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 2, 2000.

Decided March 17, 2000.

Mark L. Evans argued the cause for petitioners. With him on the briefs were William P. Barr, M. Edward Whelan III., John F. Raposa, Dan L. Poole, Robert B. McKenna, Michael K. Kellogg, Rachel E. Barkow, Lawrence E. Sarjeant, Linda Kent, John W. Hunter, and Julie E. Rones.

Laurence N. Bourne, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Joel I. Klein, Assistant Attorney General, United States Department of Justice, Catherine G. O'Sullivan and Nancy C. Garrison, Attorneys, Christopher J. Wright, General Counsel, Federal Communications Commission, and John E. Ingle, Deputy Associate General Counsel.

Mark C. Rosenblum, Peter D. Keisler, James P. Young, William Single, IV., Mark D. Schneider, Ruth M. Milkman, Robert J. Aamoth, Jonathan Jacob Nadler, Leon M. Kestenbaum, Jay C. Keithley, H. Richard Juhnke, Glenn B. Manishin, Christy C. Kunin, Renee R. Crittendon, Randall B. Lowe, Eric J. Branfman, Andrew D. Lipman, and Rodney L. Joyce. Harold R. Juhnke were on the brief for intervenors AT & T Corporation, et al. Michael B. Fingerhut, David W. Carpenter, Jodie L. Kelley, Mark B. Ehrlich, and Emily M. Williams entered appearances.

Before: EDWARDS, Chief Judge, GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Chief Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Chief Judge:

Section 251(c)(6) of the Telecommunications Act of 1996 (the "Act"), 47 U.S.C. § 251(c)(6), imposes a statutory duty on incumbent local exchange carriers ("LECs") to provide physical or virtual collocation for competing providers ("competitors"). The Act also requires the Federal Communications Commission ("FCC" or "Commission") to issue implementing regulations to fulfill the collocation mandate. See 47 U.S.C. § 251(d)(1). In March 1999, in Deployment of Wireline Services Offering Advanced Telecommunications Capability ("Collocation Order"), 14 FCC Rcd 4761 (1999), the FCC issued rules purporting to implement § 251(c)(6). According to the Commission, a principal purpose of the Collocation Order is to "adopt ... additional measures to further facilitate the development of competition in the advanced services market ... [by] strengthen[ing] ... collocation rules to reduce the costs and delays faced by competitors that seek to collocate equipment in an incumbent LEC's central office." Id. at 4764 ¶ 6.

The petitioners before the court are LECs who challenge the Collocation Order on the ground that it impermissibly imposes intrusive "physical collocation" requirements on them. Section 251(c)(6) says that LECs must provide for physical collocation of equipment "necessary for interconnection or access to unbundled network elements at the premises of the local exchange carrier." 47 U.S.C. § 251(c)(6). The FCC has taken the position that "necessary" means that "an incumbent LEC may not refuse to permit collocation of any equipment that is 'used or useful' for either interconnection or access to unbundled network elements, regardless of other functionalities inherent in such equipment." Collocation Order, 14 FCC Rcd at 4776–77 ¶ 28. Petitioners argue that, with the adoption of this rule, the FCC seeks to require collocation well beyond what has been authorized by Congress. Petitioners also claim that the Collocation Order is unauthorized and unreasonable in forcing LECs to offer competitors "cageless collocation," defining "premises" in § 251(c)(6) to include a LEC's central office and adjacent property, allowing competitors to have too much say over the placement of their equipment in a LEC's central office, and depriving LECs of an opportunity to gain full recovery of the initial costs of preparing collocation space for competitors.

Petitioners' position that "physical collocation" under the Act is limited to caged collocation is meritless, as is the claim that the FCC's definition of "premises" is unduly broad. We also reject petitioners' challenge to the cost recovery mechanism under the Collocation Order. We agree with petitioners, however, that the FCC's interpretations of "necessary" and "physical collocation" appear to be impermissibly broad. We therefore vacate the challenged Collocation Order insofar as it embraces unduly broad definitions of "necessary" and "physical collocation" and remand for further consideration by the FCC.

## I. BACKGROUND

In recent years, the FCC has sought to increase competition in the market for interstate access services, which connect long-distance companies with local telephone networks and subscribers. In 1992 and 1993, the Commission issued orders requiring LECs to set aside portions of their premises for occupation and use by competitive access providers, thus generating legal battles that have continued to the present. *See Bell Atlantic Telephone Cos. v. FCC*, 24 F.3d 1441 (D.C.Cir.1994). In their initial attempts to require LECs to permit physical collocation of competitors' equipment on demand, the FCC relied on § 201(a) of the Communications Act of 1934, 47 U.S.C. § 201(a), which empowers the agency to order "physical connections" as necessary for the public interest. The FCC reasoned that its efforts to create a level playing field of competition in the market for interstate access services served the public interest. On review, however, this court upheld a challenge to the Commission's physical collocation rule, finding that nothing in the Communications Act of 1934 explicitly authorized the FCC to order takings of LECs' property through physical collocation. *See id.* at 1446 ("The Commission's power to order 'physical connections,' undoubtedly of broad scope, does not supply a clear warrant to grant third parties a license to exclusive physical occupation of a section

of the LEC's central offices."). The court was concerned that

> *Chevron* deference to agency action that creates a broad class of takings claims, compensable in the Court of Claims, would allow agencies to use statutory silence or ambiguity to expose the Treasury to liability both massive and unforeseen.

*Id.* at 1445 (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Thus, absent a more definite congressional authorization, the court was unwilling to defer to the FCC's unduly broad reading of § 201(a).

The FCC responded to the court's ruling in *Bell Atlantic Telephone* by adopting new rules that gave LECs the option to rely more on "virtual collocation" in lieu of physical collocation. *See* Expanded Interconnection with Local Telephone Company Facilities, Memorandum Opinion and Order, 9 FCC Rcd 5154 (1994). Virtual collocation allows a LEC to retain physical control of the equipment, along with the responsibility for installing, maintaining, and repairing it. Virtual collocation therefore minimizes the takings problem, because competitors do not have physical access to a LEC's property. The LECs petitioned for review of this order, but the issue on appeal was rendered moot with the passage of the Telecommunications Act of 1996. The court therefore remanded the case for reconsideration in light of 47 U.S.C. §§ 251(c)(6) & (g), as applied after the enactment of the Telecommunications Act of 1996. *See Pacific Bell v. FCC*, 81 F.3d 1147 (D.C.Cir.1996).

The 1996 Act completely revamped the statutory landscape by providing explicit congressional authorization for physical collocation. Under § 251(c)(6), LECs are now required

> to provide, on rates, terms, and conditions that are just, reasonable, and non-discriminatory, for physical collocation of equipment *necessary for interconnection or access to unbundled network*

*elements at the premises of the local exchange carrier,* except that the carrier may provide for virtual collocation if the local exchange carrier demonstrates to the State commission that physical collocation is not practical for technical reasons or because of space limitations.

47 U.S.C. § 251(c)(6) (emphasis added).

Armed with this explicit congressional authorization, the FCC first adopted rules resembling earlier orders mandating collocation. *See* Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 (CC Docket No. 96–98), 11 FCC Rcd 15499 ("Local Competition Order"), *aff'd in part and rev'd in part, Iowa Utils. Bd. v. FCC,* 120 F.3d 753 (8th Cir.1997), *rev'd in part and aff'd. in part, AT & T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). However, under the heat of critical commentary, the Commission decided that more was necessary "to remove[ ] barriers to competition so that competing providers are able to compete effectively with incumbent LECs and their affiliates in the provision of advanced services." Collocation Order, 14 FCC Rcd at 4763 ¶ 3. After studying the issue and reviewing comments, the FCC "adopted several measures" in the Collocation Order that are designed to "promote competition in the advanced services market." *Id.* ¶ 4.

The Collocation Order obviously strengthens the Commission's stance on physical collocation. First, the Order requires LECs to allow competitors to collocate "all equipment that is necessary for interconnection or access to unbundled network elements, regardless of whether such equipment includes a switching functionality, provides enhanced service capabilities, or offers other functionalities." *Id.* at 4776 ¶ 28. In particular, the Order says that "an incumbent LEC may not refuse to permit collocation of any equipment that is 'used or useful' for either interconnection or access to unbundled network elements, regardless of other functionalities inherent in such equipment." *Id.* at 4776–77 ¶ 28. Second, the Order requires LECs to offer competitors both caged and cageless collocation. Third, the Order requires LECs to offer collocation space in both their central offices and in adjacent controlled environmental vaults or similar structures; and it prohibits LECs from imposing unreasonable minimum space requirements on collocators. Finally, the Order requires LECs to bear the initial costs of preparing collocation space for their competitors, as opposed to requiring the first collocator to bear the entire cost of preparing new collocation space—and thus bear the risk of unoccupied space—as an upfront charge. Petitioners claim that these new rules are neither authorized by the Act nor justified by reasoned decisionmaking.

## II. DISCUSSION

### A. Standard of Review

The principal issue in this case is whether the Commission's interpretation of § 251(c)(6) of the Telecommunications Act of 1996 can withstand scrutiny. In particular, petitioners challenge the FCC's Collocation Order on the ground that the agency's constructions of "necessary," "physical collocation," and "premises" will allow unauthorized takings of LEC property by their competitors.

As this court noted in *Bell Atlantic Telephone Companies v. FCC,* 131 F.3d 1044 (D.C.Cir.1997),

> *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), governs review of agency interpretation of a statute which the agency administers. Under the first step of *Chevron,* the reviewing court "must first exhaust the 'traditional tools of statutory construction' to determine whether Congress has spoken to the precise question at issue." *Natural Resources Defense Council, Inc. v. Browner,* 57 F.3d 1122, 1125 (D.C.Cir.1995) (quoting *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9). The traditional tools include examination of the statute's text, legislative history, and structure, see *Southern California Edison Co. v. FERC,* 116

F.3d 507, 515 (D.C.Cir.1997); as well as its purpose, *see First Nat'l Bank & Trust v. National Credit Union,* 90 F.3d 525, 529–30 (D.C.Cir.1996). This inquiry using the traditional tools of construction may be characterized as a search for the plain meaning of the statute. If this search yields a clear result, then Congress has expressed its intention as to the question, and deference is not appropriate. *See Hammontree v. NLRB,* 894 F.2d 438, 441 (D.C.Cir.1990). If, however, "the statute is silent or ambiguous with respect to the specific issue," *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782, Congress has not spoken clearly, and a permissible agency interpretation of the statute merits judicial deference. *Id.*

*Id.* at 1046–47.

There is no doubt here that Congress has delegated to the FCC the authority to issue regulations implementing § 251(c)(6). *See* 47 U.S.C. § 251(d)(1). It is equally clear that, given the complexity of the task at hand, any search for "plain meaning" in the statute is fruitless. The disputed terms at issue—"necessary," "physical collocation," and "premises"—all bear relatively clear definitions if taken out of the context of the statutory provision in which they are found. The problem here is that these terms are found in a *circumscribed* statutory provision that seeks to ensure competition in areas of advanced technology in telecommunications; *i.e.,* the statute gives competitors access to the private property of LECs by requiring LECs to offer physical collocation on reasonable terms, but this access is neither open-ended nor is it even required if not practical for technical reasons or because of space limitations. This is hardly the stuff of "plain meaning."

■ Because the disputed terms in § 251(c)(6) are ambiguous in their meanings, we are required to consider the Commission's interpretations. Under the second step of *Chevron,* we will defer to the Commission's interpretations if they are reasonable and consistent with the statuto-

ry purpose. *See Troy Corp. v. Browner,* 120 F.3d 277, 285 (D.C.Cir.1997) (noting that an agency's interpretation must be "reasonable and consistent with the statutory purpose"); *City of Cleveland v. U.S. Nuclear Regulatory Comm'n,* 68 F.3d 1361, 1367 (D.C.Cir.1995) (providing that an agency's interpretation must be "reasonable and consistent with the statutory scheme and legislative history"). However, a court will not uphold an interpretation "that diverges from any realistic meaning of the statute." *Massachusetts v. Department of Transp.,* 93 F.3d 890, 893 (D.C.Cir.1996). In this case, as will be shown below, the FCC's interpretations of "necessary" and "physical collocation" appear to diverge from any realistic meaning of the statute, because the Commission has favored the LECs' competitors in ways that exceed what is "necessary" to achieve reasonable "physical collocation" and in ways that may result in unnecessary takings of LEC property.

■ Petitioners' claim that the Collocation Order unfairly precludes LECs from gaining full recovery of the initial costs of preparing collocation space for competitors raises a matter that is subject to review under the traditional "arbitrary and capricious" standard. As the Supreme Court explained in *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983),

[t]he scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether

there has been a clear error of judgment." *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, [419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)]; *Citizens to Preserve Overton Park v. Volpe*, [401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)]. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given. *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). We will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, [419 U.S. at 286, 95 S.Ct. 438]. See also *Camp v. Pitts*, 411 U.S. 138, 142–143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (per curiam).

*Id.*; *see also Communications Satellite Corp. v. FCC*, 836 F.2d 623 (1988) (quoting *Motor Vehicle Mfrs. Ass'ns*, 463 U.S. at 43, 103 S.Ct. 2856). As we indicate below, the cost allocation rules under the Collocation Order easily survive arbitrary and capricious review. There is a discernible, reasoned basis for the agency's action, and the decision reached by the agency does not reflect a clear error of judgment.

We now turn to a consideration of the statutory interpretation questions, focused on the meaning of § 251(c)(6).

### B. *"Necessary"*

■ The first question in this case centers on the meaning of "necessary" under 47 U.S.C. § 251(c)(6). As noted above, the statute requires LECs to provide physical collocation of equipment as "necessary for interconnection or access to unbundled network elements at the premises of the local exchange carrier." This statutory provision is, at first blush, fairly straightforward. Something is *necessary* if it is *required* or *indispensable* to achieve a certain result. Thus, competitors who are protected by the Act have a right to collocate any equipment that is *required* or *indispensable* to achieve interconnection or access to unbundled network elements at the premises of the local exchange carrier. In the Collocation Order, however, the FCC appears to ignore the statutory reference to "necessary" in requiring LECs to collocate any competitors' equipment that is " 'used or useful' for either interconnection or access to unbundled network elements, regardless of other functionalities inherent in such equipment." 14 FCC Rcd at 4776–77 ¶ 28. Petitioners argue that by interpreting "necessary" as "used or useful" and by permitting competitors to collocate equipment that may do more than what is required to achieve interconnection or access, the FCC's Collocation Order impermissibly invites unwarranted intrusion upon LECs' property rights. The petitioners' argument has merit, for the Collocation Order as presently written seems overly broad and disconnected from the statutory purpose enunciated in § 251(c)(6).

The Collocation Order makes two critical points in interpreting "necessary" under § 251(c)(6): First, the Order says that "an incumbent LEC may not refuse to permit collocation of any equipment that is 'used or useful' for either interconnection or access to unbundled network elements, *regardless of other functionalities inherent in such equipment.*" *Id.* at 4776–77 ¶ 28 (emphasis added). Second, the Order makes it clear that LECs must allow competitors to collocate "all equipment that is necessary for interconnection or access to unbundled network elements, *regardless of whether such equipment includes a switching functionality, provides enhanced services capabilities, or offers*

*other functionalities."* *Id.* at 4776 ¶ 28 (emphasis added). In other words, the Collocation Order appears to permit competitors to collocate equipment that may do more than what is required to achieve interconnection or access.

Petitioners' concerns with the breadth of the Collocation Order are not idle. The Supreme Court recently had occasion to address a similar problem in reviewing a challenge to the FCC's interpretation of 47 U.S.C. § 251(d)(2), which provides, in relevant part, that

> [i]n determining what network elements should be made available for purposes of subsection (c)(3) of this section, the Commission shall consider . . . whether . . . access to such network elements as are proprietary in nature is necessary.

47 U.S.C. § 251(d)(2). In *AT & T Corp. v. Iowa Utilities Board,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999), the Court faced a controversy over what "necessary" meant in the context of § 251(d)(2). *See id.* at 388, 119 S.Ct. 721. The Court rejected the FCC's formulation, concluding that "the Act requires the FCC to apply *some* limiting standard, rationally related to the goals of the Act, which it has simply failed to do." *Id.* The Court noted that

> the Commission announced that it would regard the 'necessary' standard as having been met, regardless of whether 're-questing carriers can obtain the requested proprietary element from a source other than the incumbent,' since '[r]e-quiring new entrants to duplicate unnecessarily even a part of the incumbent's network could generate delay and higher costs for new entrants, and thereby impede entry by competing local providers and delay competition, contrary to the goals of the 1996 Act.' . . . The Commission cannot, consistent with the statute, blind itself to the availability of elements outside the incumbent's network. That failing alone would require the Commission's rule to be set aside. In addition, however, the Commission's assumption that *any* increase in cost (or decrease in quality) imposed by denial of

a network element renders access to that element 'necessary' . . . is simply not in accord with the ordinary and fair meaning of [the statute's] terms.

*Id.* at 389–90, 119 S.Ct. 721.

██ As is clear from the Court's judgment in *Iowa Utilities Board,* a statutory reference to "necessary" must be construed in a fashion that is consistent with the ordinary and fair meaning of the word, *i.e.,* so as to limit "necessary" to that which is required to achieve a desired goal. The Court's admonition seems particularly relevant here where a broader construction of "necessary" under § 251(c)(6) might result in an *unnecessary* taking of private property.

One clear example of a problem that is raised by the breadth of the Collocation Order's interpretation of "necessary" is seen in the Commission's rule requiring LECs to allow collocating competitors to interconnect their equipment with other collocating carriers. *See* Collocation Order, 14 FCC Rcd at 4780 ¶ 33 ("We see no reason for the incumbent LEC to refuse to permit the collocating carriers to crossconnect their equipment, subject only to the same reasonable safety requirements that the incumbent LEC imposes on its own equipment."). The obvious problem with this rule is that the cross-connects requirement imposes an obligation on LECs that has no apparent basis in the statute. Section 251(c)(6) is focused solely on connecting new competitors to LECs' networks. In fact, the Commission does not even attempt to show that cross-connects are in any sense "necessary for interconnection or access to unbundled network elements." Rather, the Commission is almost cavalier in suggesting that cross-connects are efficient and therefore justified under § 251(c)(6). This will not do. The statute requires LECs to provide physical collocation of equipment as "necessary for interconnection or access to unbundled network elements at the premises of the local exchange carrier," and nothing more. As the Supreme Court made clear in *Iowa*

*Utilities Board,* the FCC cannot reasonably blind itself to statutory terms in the name of efficiency. *Chevron* deference does not bow to such unbridled agency action.

There are other examples, as well, to demonstrate that the FCC's interpretation of "necessary" under § 251(c)(6) is impermissibly broad. At oral argument, counsel was asked whether, under the Collocation Order, a LEC would be required to afford collocation of a competitor's equipment that included *unnecessary* multi-purpose features, such as enhancements that might facilitate payroll or data collection features. In other words, must a LEC allow collocation of equipment that is not truly "necessary" for a competitor's "interconnection or access to unbundled network elements"? Counsel could offer no satisfactory answer to the question. Counsel seemed to recognize that to require collocation on such broad terms would not really square with the terms of § 251(c)(6); yet, the literal terms of the Collocation Order seem to embrace any and all equipment that is otherwise necessary without regard to whether such equipment unnecessarily *"includes a switching functionality, provides enhanced service capabilities, or offers other functionalities."* Collocation Order, 14 FCC Rcd at 4776 ¶ 28 (emphasis added). The FCC's Collocation Order seeks to justify this broad rule by contending that "competitive telecommunications providers must be permitted to collocate integrated equipment that lowers costs and increases the services they can offer their customers." *Id.* at 4777–78 ¶ 29. It was precisely this kind of rationale, based on presumed cost savings, that the Supreme Court flatly rejected in *Iowa Utilities Board. See* 525 U.S. at 389–90, 119 S.Ct. 721. In short, the FCC's interpretation of "necessary" under § 251(c)(6) goes too far and thus "diverges from any realistic meaning of the statute." *Massachusetts v. Department of Transp.*, 93 F.3d at 893.

Because, in some significant respects, the FCC's current definition of "necessary" finds no support in the Act, we va-cate the offending portions of the Collocation Order and remand the case to the agency for further consideration. We do not mean to vacate the Collocation Order to the extent that it merely requires LECs to provide collocation of competitors' equipment that is directly related to and thus necessary, required, or indispensable to "interconnection or access to unbundled network elements." Anything beyond this, however, demands a better explanation from the FCC, for the current rules under the Collocation Order make no sense in light of what the statute itself says. And the Commission must operate within the limits of "the ordinary and fair meaning of [the statute's] terms." *Iowa Utilities Bd.*, 525 U.S. at 390, 119 S.Ct. 721.

### C. "Physical Collocation" and "Premises"

■ Petitioners also challenge the FCC's interpretations of "physical collocation" and "premises" under § 251(c)(6). The Collocation Order requires LECs to make "cageless" collocation available to requesting competitors. Absent problems related to technical feasibility or specific security concerns, new competitors are entitled "to collocate in any unused space in the incumbent LEC's premises." Collocation Order, 14 FCC Rcd at 4785 ¶ 42. And to protect against bogus claims by LECs that they have run out of space, the Collocation Order provides that, when space is legitimately exhausted, LECs must "permit collocation in adjacent controlled environmental vaults or similar structures to the extent technically feasible." *Id.* at 4786 ¶ 44.

Petitioners claim that the FCC lacks the authority to promulgate such sweeping rules in support of cageless collocation, because "[a]s the language, structure, and history of § 251(c)(6) reflect, Congress understood 'physical collocation' to mean the installation of a competitor's equipment in an area that is *physically separate* from the incumbent's own facilities." Br. of Petitioners at 24. Petitioners also contend

that Congress intended collocation to be limited to available space within a LEC's central office, and not to extend to anywhere on a LEC's property beyond the confines of the central office.

Although petitioners raise some telling points, their arguments go too far. Section 251(c)(6) merely provides that incumbents have a duty to provide "for physical collocation of equipment necessary for interconnection or access to unbundled network elements *at the premises of the local exchange carrier.*" 47 U.S.C. § 251(c)(6). Congress chose not to define either "premises" or "physical collocation," and, at least in this context, the meaning of these terms is far from self-evident. Moreover, nothing in the statute can be read to *require* caged collocation, so the FCC surely was free to promulgate reasonable rules implementing physical collocation under a cageless regime.

The FCC has satisfied its burden under step two of *Chevron* in interpreting § 251(c)(6) as requiring cageless collocation. The Collocation Order points out that caged collocation results in the "inefficient use of the limited space in a LEC premises," Collocation Order, 14 FCC Rcd at 4784 ¶ 42. A cageless regime, the Order notes, ensures that LECs do not place unreasonable minimum space requirements on collocating competitors; the rule thus has the effect of reducing the cost of collocation and reducing the likelihood of premature space exhaustion. *See id.* at 4785–86 ¶ 43. We find that the agency's interpretation in support of cageless collocation is reasonable and consistent with the statutory purpose of promoting competition, without raising the threat of unnecessary takings of LEC property. Indeed, on the record at hand, it is hardly surprising that the FCC opted to prohibit LECs from forcing competitors to build cages, particularly given the alternative means available to LECs to ensure the security of their premises.

■ We also reject petitioners' claim that the FCC lacks authority to require LECs to make available space beyond their central offices for the collocation of competitors' equipment. The Collocation Order simply requires "incumbent LECs, when space is legitimately exhausted in a particular LEC premises, to permit collocation in adjacent controlled environmental vaults or similar structures to the extent technically feasible." *Id.* at 4786 ¶ 44. The rule seeks to address the "issue of space exhaustion by ensuring that competitive carriers can compete with the incumbent, even when there is no space inside the LEC's premises." *Id.* The rule clearly furthers the purpose underlying § 251(c)(6). The rule is also eminently reasonable: adjacent collocation is required only when space in the central offices is exhausted; adjacent collocation may occur only to the extent that it is technically feasible; adjacent collocation is subject to state regulations over zoning, design, and construction parameters; and adjacent collocation is subject to reasonable safety and maintenance requirements. And petitioners can find no argument to show that this rule is impermissible under § 251(c)(6), for the simple reason that the disputed "adjacent" properties all are on the LECs' "premises," which is all that is required by the statute.

In sum, the FCC's regulations forbidding LECs from requiring competitors to "cage" their equipment and requiring LECs, under limited circumstances, to use adjacent property for the collocation of competitors' equipment are permissible and reasonable under step two of *Chevron*. This is not the end of the inquiry, however, regarding petitioners' challenge to the FCC's interpretation of "physical collocation" under § 251(c)(6).

■ Petitioners argue that, even conceding the validity of cageless collocation and an interpretation of "premises" that includes both the central office and adjacent property, the Collocation Order still goes too far in giving competitors rights well beyond what is reasonably required by § 251(c)(6). In particular, petitioners

point to paragraph 42 of the Collocation Order, which states, in part, that LECs *must* give competitors the option of collocating equipment *in any unused space* within the incumbent's premises, to the extent technically feasible, and *may not* require competitors to collocate in a room or isolated space separate from the incumbent's own equipment.

*Id.* at 4785 ¶ 42 (emphases added); *see also* Reply Br. at 16 (complaining about paragraph 42). The Order acknowledges that a LEC "may take reasonable steps to protect its own equipment, such as enclosing the equipment in its own cage," *id.*, but this gloss does not save the rest of the paragraph.

The FCC offers no good reason to explain why a competitor, as opposed to the LEC, should choose where to establish collocation on the LEC's property; nor is there any good explanation of why LECs are forbidden from requiring competitors to use separate entrances to access their own equipment; nor is there any reasonable justification for the rule prohibiting LECs from requiring competitors to·use separate or isolated rooms or floors. It is one thing to say that LECs are forbidden from imposing unreasonable minimum space requirements on competitors; it is quite another thing, however, to say that competitors, over the objection of LEC property owners, are free to pick and choose preferred space on the LECs' premises, subject only to technical feasibility. There is nothing in § 251(c)(6) that endorses this approach. The statute requires only that LECs reasonably provide space for "physical collocation of equipment necessary for *interconnection or access to unbundled network elements at the premises of the local exchange carrier,*" nothing more.

The sweeping language in paragraph 42 of the Collocation Order appears to favor the LECs' competitors in ways that exceed what is "necessary" to achieve reasonable "physical collocation" and in ways that may result in unnecessary takings of LEC property. Once again we find that the FCC's interpretation of § 251(c)(6) goes too far and thus "diverges from any realistic meaning of the statute." *Massachusetts v. Department of Transp.*, 93 F.3d at 893.

The Collocation Order again suggests that there may be cost savings that will flow from the enunciated approach. *See* Collocation Order, 14 FCC Rcd at 4785 ¶ 42. This is a weak claim. First, there is no explanation from the FCC as to why this would be so. It is not intuitive that all of what is required by paragraph 42 of the Collocation Order will support a decrease in the cost of collocation and an increase in the amount of available collocation space, as suggested by the FCC. *See id.* And merely saying it does not make it so. Second, and more importantly, as noted by the Court in *Iowa Utilities Board*, "delay and higher costs for new entrants ... [that may] impede entry by competing local providers and delay competition" cannot be used by the FCC to overcome statutory terms in the Telecommunications Act of 1996. 525 U.S. at 389–90, 119 S.Ct. 721.

We therefore vacate the Collocation Order insofar as it embraces the aforecited sweeping rules on physical collocation in paragraph 42. On remand, the FCC will have an opportunity to refine its regulatory requirements to tie the rules to the statutory standard, which only mandates physical collocation as "necessary for interconnection or access to unbundled network elements at the premises of the local exchange carrier." 47 U.S.C. § 251(c)(6). Even counsel for the Commission seemed unwilling to embrace an expansive view of paragraph 42: He suggested that LECs should be allowed to choose the collocation space; he also suggested that the LECs should be allowed to segregate collocation space from the rest of a LEC's property. If *counsel's interpretation is correct*, the FCC must make that clear. In any event, paragraph 42, as presently written, does not withstand scrutiny under step two of *Chevron.*

*D. The FCC's Cost Allocation Rule*

The final issue before the court is petitioners' challenge to the FCC's cost allocation rule. The Collocation Order provides that LECs

> must allocate space preparation, security measures, and other collocation charges on a pro-rated basis so the first collocator in a particular incumbent premises will not be responsible for the entire cost of site preparation.... In order to ensure that the first entrant into an incumbent's premises does not bear the entire cost of site preparation, the incumbent must develop a system of partitioning the cost by comparing, for example, the amount of conditioned space actually occupied by the new entrant with the overall space conditioning expenses.

Collocation Order, 14 FCC Rcd at 4789 ¶ 51. State commissions are charged to oversee this process "to ensure that incumbent LECs properly allocate site preparation costs among new entrants." *Id.* at 4790 ¶ 51.

Petitioners claim that the new rule is arbitrary and capricious, because it forces LECs to bear the risk of unoccupied space. On this score, petitioners argue that "[i]t is bad enough that the incumbent must prepare space so that its competitors can take its property; it is beyond the pale that the Commission would make incumbents pay to do so." Br. of Petitioners at 32. This argument is specious.

The approach adopted by the Commission is fully justified as a reasonable way to ensure that LECs do not impose prohibitive requirements on new competitors and thus kill competition before it ever gets started. As the Government pointed out in its brief in support of the FCC,

> new entrants asserted that incumbent LEC pricing practices with respect to the preparation of collocation space acted as an unreasonable barrier to competitive entry. In particular, they assailed the practice of many [LECs] of charging the first collocator up front for the entire cost of preparing new colloca-

tion space (*e.g.,* air conditioning and power generation upgrades), even if that collocator was only going to use a small portion of the available central office space.

*See* Br. of Respondents at 16. Petitioners do not seriously challenge this assertion.

Petitioners nonetheless contend that the Commission's cost allocation rules fail to give them any reasonable mechanism to recover their costs for space that is not fully or permanently occupied. Petitioners' complaints are based, however, upon an apparent misreading of the Collocation Order. The Order does not define the contours of a recovery mechanism, but it clearly does not foreclose mechanisms for the recovery of LECs' prudently incurred costs. Rather, the Order simply notes that state commissions are charged with the responsibility of "determin[ing] the proper pricing methodology," which undoubtedly may include recovery mechanisms for legitimate costs. Collocation Order, 14 FCC Rcd at 4789–90 ¶ 51; *see also* Br. for Respondents at 51 ("[T]he *Order,* fairly read, contemplates mechanisms for the recovery of [a LEC's] prudently incurred costs."). The FCC's cost allocation rule thus withstands judicial scrutiny, because it is neither arbitrary nor capricious.

### III. CONCLUSION

Consistent with the foregoing opinion, we grant the petitions for review in part and hereby vacate the challenged Collocation Order insofar as it embraces unduly broad definitions of "necessary" and "physical collocation." The case will be remanded for further consideration by the FCC with respect to these two points. On all other points, the petition for review is denied.