AMBRO, Circuit Judge,
concurring in part and dissenting in part:
Judge Roth has written an exceptional opinion for the Court. I agree with its reasoning and conclusion that the Commonwealth has waived its sovereign immunity by regulating local telephone service in Pennsylvania within the confines of the Telecommunications Act of 1996. Nonetheless, I write separately to emphasize that our holding, and indeed the holdings of the many courts of appeals that have taken the same position, is a novel one and should be so recognized. I also write separately to dissent from the Court’s holding that the collocation of remote switching modules can be required under the 1996 Act.
A.
We hold today that the 1996 Telecommunications Act fits within the narrow exception for “gratuity waivers” discussed in College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, 527 U.S. 666, 686-87, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). The “gratuity waiver” is an exception from the general rule, set forth in College Savings Bank, that no constructive waiver of sovereign immunity can be inferred from a state’s involvement in an area subject to federal regulation. See id. at 686, 119 S.Ct. 2219. There is reason to argue, however, that we are expanding the scope of the “gratuity waiver” exception beyond the examples given in College Savings Bank.
In discussing the general rule that there can be no “constructive waiver” of Eleventh Amendment immunity, and the resultant overruling of Parden v. Terminal R. of Alabama Docks Dept., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), the Supreme Court emphasized that effective waivers of sovereign immunity, like other constitutional rights, must involve the “intentional relinquishment or abandonment of a known right or privilege.” College Sav. Bank, 527 U.S. at 682, 119 S.Ct. 2219 (citing Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). Requiring a state to possess knowledge of its immunity and to intend to waive that immunity imparts upon the state a requirement of volition — it must wish to waive its immunity.
Moreover, the Court in College Savings Bank noted one other component of effective waiver; it requires a“ ‘clear declaration’ by the State of its waiver ... to be certain that the State in fact consents to suit.” Id. at 680, 119 S.Ct. 2219 (emphasis in original). This expression of intentional relinquishment must be unequivocal. Id. That is, not only must the waiver be clear, but the state cannot equivocate in expressing its intent. Under these standards, it is *524 the rare ease that a federal court would find the waiver of sovereign immunity.
Despite the Supreme Court’s invocation of these two hallmarks of effective sovereign immunity waiver — intention and clarity of expression — it left a vestige of constructive waiver in those situations in which the waiver is exacted as a condition to the state’s acceptance of Congress’s gratuity. College Sav. Bank at 686-87, 119 S.Ct. 2219. The Court cited two cases in support of the concept of “gratuity waiver,” Petty v. Tennessee-Missouri Bridge Comm’n, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959), and South Dakota v. Dole, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). In Petty, Congress approved a bistate commission created by an interstate compact containing a clause allowing suit. Petty, 359 U.S. at 277-78, 79 S.Ct. 785. The Court in College Savings Bank concluded that because states were barred from forming such compacts by the Constitution, Congress’s consent to a compact was a gratuity in that it granted powers to a state entity previously denied to it. More importantly for our purposes, the Supreme Court held that this gratuity — the approval of an interstate compact — could be conditioned on the waiver of sovereign immunity and that courts could infer waiver from the state’s acceptance of that gratuity. College Sav. Bank, 527 U.S. at 686, 119 S.Ct. 2219. Similarly, in South Dakota v. Dole, states received funding from the federal government conditioned on each state’s acceptance of a uniform drinking age. 483 U.S. at 205, 107 S.Ct. 2793. In both cases, Congress lacked the power to abrogate the states’ sovereign immunity (in Petty) or require a mandatory drinking age (in Dole), but Congress’s grant of a gratuity permitted it to require as a condition of the gift the very waiver or action it could not accomplish in its own right. College Sav. Bank, 527 U.S. at 686, 119 S.Ct. 2219.
Notably, in both cases cited in College Savings Bank, it was entirely clear to the state from the face of the statute itself that it was agreeing to Congress’s condition. For example, in Petty, Congress “approved a sue-and-be-sued clause in a compact under conditions that make it clear that the States accepting it waived any immunity from suit which they otherwise might have.” Petty, 359 U.S. at 280, 79 S.Ct. 785. Similarly, the statute at issue in Dole so clearly exacted a condition on the grant of highway funds that the State of South Dakota itself sued to establish its unconstitutionality. Dole, 483 U.S. at 205, 107 S.Ct. 2793. Thus, we can assume that for “gratuity waivers” the clarity the Court demanded in College Savings Bank, for the state’s expression of waiver has simply shifted sources. Rather than requiring a “ ‘clear declaration’ by the State,” College Sav. Bank, 527 U.S. at 680, 119 S.Ct. 2219, we now require a clear declaration from Congress that, by accepting the gratuity, the states will forfeit whatever rights Congress chooses to attach as a condition.[1] See Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 247, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) (finding an act of Congress does not clearly evince its intention to require states receiving funds to waive their sovereign immunity).
This requirement of clarity on Congress’s part is a necessary component of inferring from a state’s actions its decision to waive its sovereign immunity. Con *525 gress’s clarity of expression and the resulting action by the state substitute for the state’s own expression of waiver. It is in satisfaction of this requirement of a “constructive waiver” that the courts of appeals have concluded that the 1996 Telecommunications Act clearly expresses Congress’s intention to attach a condition to its gratuity of regulatory authority over local telephone service. See Maj. Opinion at 508-10 (listing cases); but see Bell Atlantic Maryland, Inc. v. MCI Worldcom, Inc., 240 F.3d 279, 293 (4th Cir.2001) (“[a] State official reading this provision would have no indication that the State commission, if it chose to make the reviewable determination, would be compelled to appear in federal court at the behest of an aggrieved telecommunications company”).
Clarity, however, is only half of the requirements of effective waiver. As noted above, the Supreme Court emphasized in College Savings Bank that a waiver of sovereign immunity must also be “intentional.” 527 U.S. at 682, 119 S.Ct. 2219. The “gratuity waiver” of the Commonwealth that we approve today lacks on its face any indicia of being intentional. The Pennsylvania Utility Commission has steadfastly maintained that it did not intend to waive its immunity from suit and that its arbitration and approval of the interconnection agreement was an action taken pursuant to state law, not the 1996 Act. Of course, we recognized in the majority opinion that the 1996 Act federalized the provision of local telephone services and therefore rejected the PUC’s reliance on state authority. See Majority Op. at 510-12; AT & T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 378 n. 6, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999) (“With regard to the matters addressed by the 1996 Act, [Congress has] unquestionably [taken the regulation of local telecommunications competition away from the States]”).
Nonetheless, the PUC’s reliance on state law is interesting for another reason. Unlike Petty and Dole, the PUC has not made any affirmative manifestation of its acceptance of Congress’s gratuity, such as the new operation of a bistate commission or acceptance of federal highway funds. Instead, it has merely continued what it has always done — regulate local telephone service for Pennsylvanians. When Congress has taken away the PUC’s authority with one hand and returned it (albeit in a new framework) with the other, it is difficult to understand what it is that the PUC has to do to manifest its acceding to Congress’s condition that it waive sovereign immunity. Indeed, we have no indication here that Pennsylvania intended to waive its sovereign immunity at all,[2] other than its continued presence in a field of regulation in which it has operated for the better portion of the twentieth century.
Thus, our case stands for the proposition that a “gratuity waiver” can exist even without conduct expressly accepting that gratuity, if Congress is sufficiently clear in structuring its condition. It is not simply that Congress has said that states will waive their sovereign immunity if they accept the new authority. Congress has said that if states continue to act as they have, they will waive their sovereign immunity, and thus has mandated that the states take action if they do not wish to waive their immunity. Conversely, the affirma *526 tive act indicating an intention to accept the gratuity is not the simple acceptance of new money or new authority, it is the failure to refuse the grant of an authority previously possessed.[3]
Because I believe that questions of the constitutional viability of “cooperative federalism” will repeat themselves as long as Congress continues to fashion such creative regulatory regimes, we should acknowledge this novelty. See College Sav. Bank, 527 U.S. at 702-03, 119 S.Ct. 2219 (Breyer, J., dissenting) (discussing the need for legislative flexibility to foster national uniformity in regulation while preserving local control). With as yet no Supreme Court determination with respect to the issue before us, I believe that the efficacy of “cooperative federalism” requires our Court’s flexibility in this instance.
B.
I also respectfully dissent from the majority’s interpretation of collocation requirements of the 1996 Telecommunications Act. The Act forces ILECs “to provide, on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, for physical collocation of equipment necessary for interconnection or access to unbundled network elements at the premises of the local exchange carrier.” 47 U.S.C. § 251(c)(6) (emphasis added).
The majority affirms the District Court’s order affirming the PUC’s determination that Worldcom be permitted to collocate remote switching modules in Verizon’s offices. Instead, I would adopt the position that locating remote switching modules in the central offices of an ILEC (Verizon) is not “necessary to interconnect” to the ILEC’s network. 47 U.S.C. § 251(c)(6); see GTE Serv. Corp. v. FCC, 205 F.3d 416, 423-24 (D.C.Cir.2000) (FCC regulations permitting collocation of remote switching modules exceeds the reach of § 251(c)(6) by interpreting “necessary” to mean efficient or useful).
While the majority correctly notes that the FCC has promulgated new regulations in response to the D.C. Circuit’s ruling in GTE Serv. Corp., those regulations continue to permit the collocation of remote switching modules without regard for Congress’s express limitations in § 251(c)(6) to those devices “necessary” to interconnect. The majority’s reasoning is plausible. Yet it has substituted its responsibility to interpret what “necessary” means with broad policy statements regarding what it believes to be the most efficient means of accomplishing collocation. Assuming the remote switching devices result in certain efficiencies, they are not necessary for interconnection of CLECs to the ILEC’s network. Because I would adopt the position of the D.C. Circuit that the term *527 “necessary” constrains the authority of the PUC to mandate collocation of devices that do more than provide the essential interconnection required by the Telecommunications Act, I respectfully dissent.

. This mirrors the requirement that Congress's abrogation of sovereign immunity be clear and unequivocal. See Quern v. Jordan, 440 U.S. 332, 343-44, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Of course, abrogation and waiver are closely related. "Forced waiver and abrogation are not even different sides of the same coin — they are the same side of the same coin.” College Sav. Bank, 527 U.S. at 683, 119 S.Ct. 2219.

. This stands in stark contrast to states such as Delaware, for example, which has authorized its utility commission to act pursuant to the 1996 Act. See Bell Atlantic-Delaware v. McMahon, 80 F.Supp.2d 218, 232 (D.Del.2000); 26 Del.Code § 703(4) (1998). While the Delaware General Assembly did not expressly waive its sovereign immunity by this statute, it is evidence that the State intended to accept the benefit of regulating under its mandate. See Bell Atlantic-Delaware, 80 F.Supp.2d at 232 n. 10.

. If we recognize that the constructive waiver in this case is inferred based on a state's continuing regulation of telecommunications, and not any affirmative acceptance of the 1996 Act, one might conclude that Congress has skirted dangerously close to creating a sanction and not the grant of a gratuity. The Court in College Savings Bank suggested a distinction between a condition placed on a gift and a sanction — the former being an acceptable means of securing the waiver of sovereign immunity from a state and the latter not. College Sav. Bank, 527 U.S. at 687, 119 S.Ct. 2219. A sanction exists if Congress excludes "the State from otherwise permissible activity.” Id. As the majority correctly notes, because the 1996 Act removes local telephone regulation from the states and because doing so is wholly lawful, see Hodel v. Virginia Surface Mining and Reclamation Ass'n, 452 U.S. 264, 290, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), it is not a sanction. Maj. Op. at 510-12. Thus, while Pennsylvania has waived its sovereign immunity without an affirmative expression of its acceptance of a gratuity, it is nevertheless a gratuity that it has received.