

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-7-2001

# MCI Telecomm Corp v. Bell Atl PA

Precedential or Non-Precedential:

Docket 00-2257

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"MCI Telecomm Corp v. Bell Atl PA" (2001). *2001 Decisions.* Paper 258.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/258

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 2, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-2257 and 00-2258

MCI TELECOMMUNICATION CORPORATION,
a Delaware Corporation; MCIMETRO ACCESS
TRANSMISSION SERVICES, INC., a Delaware Corporation;

AT&T COMMUNICATION OF PENNSYLVANIA;
UNITED STATES OF AMERICA
(Intervenors-Plaintiffs in District Court)

v.

BELL ATLANTIC-PENNSYLVANIA; PENNSYLVANIA PUBLIC
UTILITY COMMISSION; JOHN M. QUAIN; ROBERT K.
BLOOM; JOHN HANGER; DAVID W. ROLKA; NORA M.
BROWNELL, in their official capacities as Commissioners
of the Pennsylvania Public Utility Commission

       PENNSYLVANIA PUBLIC UTILITY
       COMMISSION; JOHN M. QUAIN; ROBERT K.
       BLOOM; JOHN HANGER; DAVID W. ROLKA;
       NORA MEAD BROWNELL, in their official
       capacities as Commissioners of the
       Pennsylvania Public Utility Commission,

       Appellants (00-2257)

       BELL ATLANTIC-PENNSYLVANIA, INC.,

       Appellant (00-2258)

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 97-cv-01857)
District Judge: Honorable Sylvia H. Rambo

Argued June 21, 2001

Before: ROTH, AMBRO and FUENTES, Circuit Judge s

(Filed November 2, 2001)

       Maureen F. Del Duca, Esquire
       Jodie L. Kelley, Esquire
       James A. Trilling, Esquire
       Jenner & Block
       601 13th Street, N.W., 12th Floor
       Washington, D.C. 20005

       Jeffrey A. Rackow, Esquire (Argued)
       MCI Worldcom, Inc.
       1133 19th Street, N.W.
       Washington, D.C. 20036

        Attorneys for Appellees
       MCI Telecom Corp. and
       MCIMETRO Access Transmission
       Services, Inc.

       David M. Levy, Esquire (Argued)
       Stephen B. Kinnaird, Esquire
       Michael L. Post, Esquire
       Sidley & Austin
       1722 Eye Street, N.W.
       Washington, D.C. 20006

       Daniel Clearfield, Esquire
       Alan C. Kohler, Esquire
       Joseph C. Crawford, Esquire
       Wolf, Block, Schorr & Solis-Cohen
       1650 Arch Street, 22nd Floor
       Philadelphia, PA 19103-2097

       Mark A. Keffer, Esquire
       Robert C. Barber, Esquire
       AT&T Communications
       3033 Chain Bridge Road
       Oakton, VA 22185

        Attorneys for Appellee
       AT&T Communications of PA, Inc.

David M. Barasch
 United States Attorney
Stuart E. Schiffer
 Acting Assistant Attorney General
Mark B. Stern, Esquire
Charles W. Scarborough, Esquire
Kathleen A. Kane, Esquire
United States Department of Justice
Civil Division, Appellate Staff
601 D Street, N.W.
Washington, D.C. 20530

 Attorneys for Appellee
United States of America

Thomas B. Schmidt, III, Esquire
Donna L. Fisher, Esquire
Kelly Ann Ryan, Esquire
Pepper Hamilton LLP
200 One Keystone Plaza
North Front and Market Streets
P.O. Box 1181
Harrisburgh, PA 17108-1181

Julia A. Conover, Esquire
Suzan DeBusk Paiva, Esquire
 (Argued)
Verizon Pennsylvania Inc.
1717 Arch Street, 32N
Philadelphia, PA 19103

 Attorneys for Appellant
Bell Atlantic-Pennsylvania, Inc. in
No. 00-2258

Bohdan R. Pankiw
 Chief Counsel
Robert J. Longwell
 Deputy Chief Counsel
Maryanne R. Martin (Argued)
 Assistant Counsel
Pennsylvania Public Utility
 Commission
P.O. Box 3265
Harrisburg, PA 17105-3265

 Attorneys for Appellants
Pennsylvania Public Utility
Commission, John M. Quain,
Robert K. Bloom, John Hanger,
David W. Rolka, Nora Mead
Brownell, in their official capacities
as Commissioners of the
Pennsylvania Public Utility
Commission in No. 00-2257

Counsel on Sovereign Immunity
 Issues Exclusively
Albert G. Bixler, Esquire (Argued
 for Appellants)
Susan D. Paiva, Esquire (Argued
 for Appellees)

OPINION OF THE COURT

ROTH, Circuit Judge:

In passing the Telecommunications Act of 1996, Congress altered the regulatory scheme for local telephone service. The Act requires that local service, which was previously operated as a monopoly overseen by the several states, be opened to competition according to standards established by federal law. Under the Act, the incumbent local telephone service carriers must negotiate or arbitrate agreements with competitive local carriers, allowing entering carriers either to connect their equipment to the existing network or to purchase or lease elements and

4

services of the existing network. The terms, rates, and conditions of such arrangements are set forth in interconnection agreements established between the carriers. The state utility commissions are empowered, but not required, to review and give final approval to interconnection agreements to ensure that they comport with federal law.

Verizon Pennsylvania, Inc. (Verizon -- known at that time as Bell Atlantic-Pennsylvania, Inc.), the incumbent local carrier in Pennsylvania, entered into negotiations with MCI/Worldcom (Worldcom), a competing carrier which sought to provide local telephone service. After various negotiations and arbitrations by the Pennsylvania Public Utility Commission (PUC), the parties established an interconnection agreement and submitted it to the PUC which approved it contingent on certain revisions and the incorporation of certain rates. Worldcom then brought suit in federal court against Verizon, the PUC, and the PUC Commissioners, under 47 U.S.C. S 252(e)(6), the judicial review provision of the Act, to challenge certain terms of the agreement; Verizon counterclaimed and cross-claimed to challenge other aspects of the agreement. The PUC and PUC Commissioners moved to dismiss the action, arguing that they were immune from suit under the Eleventh Amendment of the United States Constitution. The District Court rejected the immunity claim and the PUC did not appeal at that time. The District Court then resolved all the substantive claims asserted by Worldcom and Verizon. The PUC and Verizon each appealed and the appeals were consolidated.

The District Court had jurisdiction to review the interconnection agreement pursuant to 47 U.S.C. S 252(e)(6) and had general federal question jurisdiction pursuant to 28 U.S.C. S 1331. We have jurisdiction over the final decision of a District Court, pursuant to 28 U.S.C. S 1291.

For the reasons that follow, we conclude that the PUC and the Commissioners are not entitled to Eleventh Amendment immunity from suit in federal court under the 1996 Act. We will, therefore, affirm the decision of the District Court on this issue. On the questions, raised by

Verizon and the PUC regarding the terms of the interconnection agreement, we will affirm the District Court in part and reverse it in part.

I. Statutory Background

Prior to 1996, local telephone service operated as a monopoly, subject to exclusive regulation by the several states. In each local service area, the states would grant a monopoly franchise to one local exchange carrier, which owned the facilities and equipment necessary to provide telephone service. See AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 370 (1999) (Iowa Utils. I). With the Telecommunications Act of 1996, Congress fundamentally restructured local telephone markets by eliminating state-granted local service monopolies. See id. The Act preempts exclusive state regulation of local monopolies in favor of the competitive scheme established in 47 U.S.C. SS 251 and 252. See AT&T Communications v. Bellsouth Telecomm. Inc., 238 F.3d 636, 641 (5th Cir.), reh'g en banc denied, 252 F.3d 437 (5th Cir. 2001) (Bellsouth).

The Act essentially requires incumbent local exchange carriers (ILECs) to share their networks and services with competitors seeking entry into the local service market. See MCI Telecomm. Corp. v. Illinois Bell Tel. Co., 222 F.3d 323, 328 (7th Cir. 2000), cert. denied, 121 S. Ct. 896 (2001). Under the Act, a new entrant to the local telephone market, known as a competitive local exchange carrier (CLEC), is able to compete with an ILEC without having to bear the prohibitive cost of building its own telecommunications network. See id. Both an ILEC and a CLEC are required to "negotiate in good faith" the "terms and conditions of agreements" which will permit the CLEC, as well as other providers, to share the network and to provide service. 47 U.S.C. S 251(c)(1). The FCC is empowered to promulgate regulations to implement the requirements of the Act. 47 U.S.C. S 251(d)(1); see also Iowa Utils. I , 525 U.S. at 384 (upholding FCC rulemaking authority, including its power to determine the methodology for establishing prices).

Section 251 and FCC regulations establish three methods of providing a CLEC access to a local network. See Iowa

6

Utils. I, 525 U.S. at 370; GTE South, Inc. v. Morrison, 199 F.3d 733, 737 (4th Cir. 1999). First, a CLEC may build its own network and "interconnect" with the incumbent network. 47 U.S.C. S 251(c)(2). Such interconnection must be, inter alia, for the "transmission and routing of telephone exchange service and exchange access," 47 U.S.C. S 251(c)(2)(A), "at any technically feasible point within the [incumbent] carrier's network," 47 U.S.C.S 251(c)(2)(B), and "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory." 47 U.S.C. S 251(c)(2)(D), 47 C.F.R. S 51.305. An ILEC which denies a CLEC access to the network at a particular point must "prove to the state commission that interconnection at that point is not technically feasible." 47 C.F.R. S 51.305(e).

Second, a CLEC may lease individual elements of the existing network on an "unbundled basis" at"any technically feasible point" on "rates, terms, and conditions that are just, reasonable, and nondiscriminatory." 47 U.S.C. S 251(c)(3), 47 C.F.R. SS 51.307-51.319. A network element is "a facility or equipment used in the provision of a telecommunications service," i.e.,"features, functions, and capabilities that are provided by means of such facility or equipment, including subscriber numbers, databases, signaling systems, and information sufficient for billing and collection or used in the transmission, routing or other provision of a telecommunications service." 47 U.S.C. S 153(29). The FCC determines the network elements that must be made available for purposes of S 251(c)(3); in so doing, it must consider 1) whether access to proprietary network elements is necessary and 2) whether the failure to provide access to a given element would "impair" the ability of the CLEC to provide services. 47 U.S.C. S 251(d)(2).

Lease rates for network elements must be based on forward-looking costs, meaning the sum of the "total element long-run incremental cost of the element," plus a reasonable allocation of "forward-looking common costs." 47 C.F.R. S 51.505(a)(1), (2). Total element long-run incremental cost, or TELRIC, is the "forward-looking cost over the long run of the total quantity of the facilities and functions that are directly attributable to, or reasonably identifiable as incremental to, such element." 47 C.F.R. S 51.505(b).

7

Third, a CLEC may purchase from the ILEC for resale "at wholesale rates any telecommunications service the carrier provides at retail to subscribers who are not telecommunications carriers." 47 U.S.C. S 251(c)(4)(A), 47 C.F.R. SS 51.601–51.617. In other words, the CLEC will purchase telecommunications service from the ILEC at wholesale rates and resell those services to customers. Telecommunications service is defined as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. S 153(46). Telecommunications, in turn, means "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. S 153(43).

The FCC established a wholesale pricing standard for S 251(c)(4), equal to "the rate for the telecommunications service, less avoided retail costs." 47 C.F.R.S 51.607. The regulations define avoided retail costs as "those costs that reasonably can be avoided when an incumbent ILEC provides a telecommunication service for resale at wholesale rates to a requesting carrier." 47 C.F.R. S 51.609(b). The Eighth Circuit has, however, struck down that pricing standard as contrary to the Act. See Iowa Utils. Bd. v. FCC, 219 F.3d 744, 755–56 (8th Cir. 2000), cert. granted in part, denied in relevant part, 121 S. Ct. 878 (2001) (Iowa Utils. II).

In addition, in gaining access to a local network, a CLEC must be permitted to physically collocate on the ILEC's premises any equipment necessary for interconnection or for access to unbundled network elements, on rates, terms, and conditions that are just, reasonable, and nondiscriminatory. 47 U.S.C. S 251(c)(6). An ILEC may provide for virtual collocation instead if it demonstrates that physical collocation is not practical for technical reasons or because of space limitations. 47 U.S.C. S 251(c)(6).

Section 252 sets out the process by which interconnection agreements between ILECs and CLECs are to be established. See MCI, 222 F.3d at 328; GTE South,

199 F.3d at 737. An incumbent and a requesting carrier may "negotiate and enter into a binding agreement." 47 U.S.C. S 252(a)(1). Such negotiations generally will begin with a request for interconnection by the CLEC. 47 U.S.C. S 252(a)(1). At any time during negotiations, either party may ask the state utility commission to participate in negotiations and mediate any differences. 47 U.S.C. S 252(a)(2). The Act's clear preference is for such negotiated agreements. See Iowa Utils. I, 525 U.S. at 405 (Thomas, J., concurring in part and dissenting in part). An agreement reached through negotiation need not conform to all the detailed, specific requirements of S 251; negotiation consequently bestows a benefit to those carriers able to resolve issues through negotiation and compromise. See MCI Telecomm. Corp. v. U.S. West Communications, 204 F.3d 1262, 1266 (9th Cir. 2000); 47 U.S.C. S 252(a)(1). A negotiated agreement must merely be nondiscriminatory to a carrier not a party to the agreement and also be in the public interest. See 47 U.S.C. S 252(e)(2)(A).

Negotiations may, however, prove unsuccessful. Cf. GTE South, 199 F.3d at 737 (stating that it is hard to see how negotiations would not fail). Either party, during the period from 135 to 160 days after a CLEC's request for interconnection, may petition a state utility commission to arbitrate any unresolved issues. 47 U.S.C. S 252(b)(1). The Act and FCC regulations detail the procedures and standards that the state must follow in conducting the arbitration. 47 U.S.C. S 252(b), (c), (d); MCI, 222 F.3d at 328. The state utility commission must resolve all the issues raised in the arbitration and may impose appropriate conditions on the parties in order to resolve those issues. 47 U.S.C. S 252(b)(4)(C). When a state utility commission engages in arbitration, it must ensure that resolution of the issues and any conditions imposed on the parties to the arbitration meet the requirements of S 251 and of the FCC regulations, it must establish any rates, and it must provide a schedule for implementation of the terms and conditions by the parties to the agreement. 47 U.S.C. S 252(c). The arbitrated terms are incorporated into the parties' interconnection agreement.

Any interconnection agreement, whether reached through negotiation or arbitration, must be submitted to the state

utility commission, which "shall approve or reject the agreement, with written findings as to any deficiencies." 47 U.S.C. S 252(e)(1). The standards for the commission's review depend, however, on whether the agreement was reached by negotiation or by arbitration. A state commission may reject a negotiated agreement only if it finds that 1) the agreement discriminates against a carrier not a party to the agreement or 2) implementation of the agreement would not be consistent with the "public interest, convenience, and necessity." 47 U.S.C. S 252(e)(2)(A); see also MCI v. U.S. West , 204 F.3d at 1266. A state utility commission may reject an arbitrated agreement, or part of an arbitrated agreement, if it finds that the agreement, or part of the agreement, does not meet the requirements of S 251, including FCC regulations under S 251, or the pricing standards of S 252(d). 47 U.S.C. S 252(e)(2)(B); see also MCI, 222 F.3d at 328-29. If the state utility commission does not act to approve or reject a negotiated agreement within 90 days of its submission or an arbitrated agreement within 30 days of submission, the agreement "shall be deemed approved." See  47 U.S.C. S 252(e)(4); 47 C.F.R. S 51.801(c).

If a state utility commission "fails to act" to carry out any of its responsibilities under S 252, the FCC is to assume responsibility and act in place of the state commission in carrying out these duties. 47 U.S.C. S 252(e)(5); 47 C.F.R. S 51.803-51.807. Pursuant to FCC regulations, a state utility commission "fails to act" if it fails to respond within a reasonable amount of time to a request for mediation or arbitration. 47 C.F.R. S 51.801(b). If a state utility commission fails to act, the carrier's exclusive remedy is to present the issues and agreement to the FCC and to seek judicial review of any FCC determinations on those issues. 47 U.S.C. S 252(e)(4); see also MCI, 222 F.3d at 329. A state commission does not fail to act if, because of the commission's inaction, an agreement is deemed approved. 47 C.F.R. S 51.801(c). As the Seventh Circuit explained, sections 252(e)(1), (e)(4), and (e)(5) together"create a scheme that provides regulatory oversight of interconnection agreements, either by a state commission or by the FCC in the state commission's place." See MCI, 222 F.3d at 329.

10

When a state utility commission has approved or rejected an agreement under S 252(e)(1), "any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements" of SS 251 and 252. 47 U.S.C. S 252(e)(6). No state court has jurisdiction to review the actions of a state commission in approving or rejecting an interconnection agreement. 47 U.S.C. S 252(e)(4).

II. Litigation Background

Worldcom requested interconnection and began negotiations with incumbent carrier Verizon for an agreement to permit Worldcom to provide local service in Pennsylvania. Certain issues were not resolved by negotiation. The parties then went to arbitration before the PUC, which issued orders resolving those issues and requiring the arbitrated terms to be incorporated into the final agreement. After continued negotiations and additional rulings from the PUC, the parties reached a final agreement and submitted it to the PUC, which approved it contingent on certain revisions and the incorporation of certain rates.

Worldcom then brought suit under S 252(e)(6) in federal court, naming as defendants the PUC, several individual PUC Commissioners, and Verizon. The suit challenged several terms of the approved agreement. AT&T Communications of Pennsylvania (AT&T), another CLEC seeking to gain entry into local telephone service, intervened as a plaintiff. Verizon counterclaimed against Worldcom and AT&T and cross-claimed against the PUC to challenge other aspects of the agreement. The United States intervened as a plaintiff in order to defend the constitutionality of S 252(e)(6).

The PUC and the Commissioners moved to dismiss the action on Eleventh Amendment grounds, arguing that they had sovereign immunity from suit in federal court under the Act and that S 252(e)(6), which authorized the suit, was unconstitutional. The District Court denied the motions.[1]

_____

1. The District Court also rejected PUC challenges to the Act under the Commerce Clause, U.S. Const. art. I, S 8, cl. 1, and the Tenth Amendment. None of these issues has, however, been raised in the present appeal.

11

The PUC and the Commissioners did not at that time appeal the denial of their Eleventh Amendment immunity claim.

Because there were no disputed issues of fact, the parties then cross-moved for summary judgment. The Magistrate Judge made a Report and Recommendation, which the District Court adopted in part and rejected in part. The District Court considered and resolved five issues that now are on appeal before this Court.

The first issue concerns interconnection in Local Access and Transport Areas (LATAs). The PUC had required that Worldcom interconnect in each access tandem serving area, rather than at a single point within each LATA. An access tandem serving area is a geographic area containing several local switches that subtend a single access tandem switch. Each LATA contains at least one access tandem area, but some LATAs in Pennsylvania contain more than one. The PUC's order required Worldcom to interconnect at each tandem switch, even if it already had connected at another point within that LATA. The District Court vacated that term of the interconnection agreement as contrary to the Act.

Second, the PUC had required Verizon to permit Worldcom to collocate remote switching modules (RSMs) in Verizon's central offices. RSMs are devices used for interconnection. An RSM also contains switches with the limited capability of so-called line-to-line switching, switching calls between two customers, each of whom is served by unbundled loops. An RSM can be used to access unbundled loops and to interconnect to them, but it can also switch calls between Worldcom customers. In other words, RSMs are a single piece of equipment that enables the CLEC to perform several functions, including both interconnection and switching. Verizon contended that an RSM was not "necessary" for interconnection and that Verizon could not be required to permit collocation of such equipment. The Magistrate Judge and District Court rejected this argument and affirmed that portion of the interconnection agreement.

Third, the PUC had required Verizon to sell directory publishing services at wholesale rates as a

12

telecommunications service. Directory publishing services include basic listings with customer telephone numbers, as well as additional services such as vanity numbers, bold and foreign listings in the White Pages, and non-listing and non-publication of customers' telephone numbers. Verizon argued that directory publishing services were not telecommunications services under the Act. The Magistrate Judge rejected this argument, but the District Court accepted it and struck down this provision of the agreement.

Fourth, the PUC had established wholesale rates to be charged to Worldcom for resale of telecommunications services. Verizon objected to the rates, but the District Court rejected Verizon's argument and affirmed the PUC-approved rates contained in the agreement.

Fifth, the PUC had established the prices to be charged for unbundled network elements, using what it called TSLRIC, or total service long-run incremental cost, methodology. Worldcom argued that the PUC had not used the required forward-looking TELRIC methodology established by the FCC. The District Court agreed and remanded to the PUC for it to establish new rates using the proper TELRIC methodology.

The PUC and Verizon both timely appealed the decisions of the District Court; the appeals were consolidated.

III. Sovereign Immunity

We first address the PUC's and Commissioners' appeal of the District Court's rejection of their claims of sovereign immunity under the Eleventh Amendment.[2]  Our review of a District Court's denial of sovereign immunity is plenary. See Lavia v. Pennsylvania Dept. of Corr., 224 F.3d 190, 194-95 (3d Cir. 2000).

_____

2. We consolidated oral argument on the sovereign immunity issues in this case with the same issues raised in Bell Atl.-Pennsylvania, Inc. v. Pennsylvania Public Util. Comm'n, Nos. 00-2619, 00-2620, decided this day. The legal issues and arguments and our resolution of them are the same in both cases.

13

A. Background to the Eleventh Amendment

We begin with an overview of Eleventh Amendment jurisprudence. That amendment has been interpreted to make states generally immune from suit by private parties in federal court. See Board of Tr. of Univ. of Alabama v. Garrett, 121 S. Ct. 955, 962 (2001); College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 669–70 (1999); Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267 (1997); Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996); Lavia, 224 F.3d at 195. This immunity extends to state agencies and departments. See C.H., ex rel. Z.H. v. Oliva, 226 F.3d 198, 201 (3d Cir. 2000) (en banc).

Eleventh Amendment immunity is subject to three exceptions: 1) congressional abrogation, 2) state waiver, and 3) suits against individual state officers for prospective relief to end an ongoing violation of federal law.

First, Congress may, in some limited circumstances, abrogate sovereign immunity and authorize suits against states. If a statute has been passed pursuant to congressional power under S 5 of the Fourteenth Amendment to enforce the provisions of that amendment, Congress can abrogate a state's sovereign immunity. See Garrett, 121 S. Ct. at 962; College Savings , 527 U.S. at 670; U.S. Const. amend. XIV, S 5 (1868).3  Congress may not, however, abrogate state sovereign immunity when a statute is passed pursuant to its Article I powers, such as the Commerce Clause, U.S. Const. art. I, S 8, cl. 3. See Garrett, 121 S. Ct. 962; Seminole Tribe, 517 U.S. at 72–73 (holding that the Eleventh Amendment limits the federal judicial power and Article I cannot be used to circumvent the constitutional limits placed on the courts). The Telecommunications Act of 1996 was clearly a

_____

3. A federal statute does not abrogate Eleventh Amendment immunity where the statute, although purportedly passed pursuant to S 5, is not appropriate S 5 legislation because it goes beyond the scope of what the Fourteenth Amendment itself protects. See Garrett, 121 S. Ct. at 962; id. at 967–68 (holding that nonconsenting states could not be sued under Title I of the Americans With Disabilities Act, which accorded more protection to disabled persons than did the Equal Protection Clause).

14

congressional exercise of its Commerce Clause power. Congress did not, and could not, abrogate Eleventh Amendment immunity in providing for federal court review in S 252(e)(6). Abrogation is not implicated here.

Second, a state may waive sovereign immunity by consenting to suit. See College Savings, 527 U.S. at 670 (citing Clark v. Barnard, 108 U.S. 436, 447-48 (1883)). The waiver by the state must be voluntary and our test for determining voluntariness is a stringent one. See College Savings, 527 U.S. at 675 (citing Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241 (1985)). The state either must voluntarily invoke our jurisdiction by bringing suit (not the case here) or must make a " `clear declaration' that it intends to submit itself to our jurisdiction." See College Savings, 527 U.S. at 676 (citing Great Northern Life Ins. Co. v. Read, 322 U.S. 47, 54 (1944)). The decision to waive immunity must be an "altogether voluntary" one, and, as with any other waiver of a constitutional right, there must be an "intentional relinquishment or abandonment of a known right or privilege." College Savings , 527 U.S. at 681-82.

The difficult question we now face is how do we infer waiver from a state's actions. To answer this question, we must turn to the Supreme Court's recent decision in College Savings. There, the Court held that a suit against a state agency under the Trademark Remedy Clarification Act, alleging that the state agency had made false and misleading advertising statements, was barred by the Eleventh Amendment. See College Savings, 527 U.S. at 691. The Court held that the state's sovereign immunity was not validly abrogated by the Act and not voluntarily waived by the state's mere participation in an activity in interstate commerce, such as providing student loan services and advertising those services. See id.

The Court, in rejecting waiver of Eleventh Amendment immunity in College Savings, overturned the constructive waiver doctrine formerly established in Parden v. Terminal R. of Alabama State Docks Dept., 377 U.S. 184 (1964). See College Savings, 527 U.S. at 680 ("Whatever may remain of our decision in Parden is expressly overruled."); id. ("We think that the constructive-waiver experiment of Parden

15

was ill conceived, and see no merit in attempting to salvage any remnant of it."). Parden involved the operation by a state of a railroad in interstate commerce. In Parden, the Court had held that, if the state had notice when it entered a field which was subject to congressional oversight or regulation that it would be subject to suit in federal court, then the state was deemed to have waived immunity and consented to suit. Parden, 377 U.S. at 192 (concluding that state, when it began operation of a railroad in interstate commerce, 20 years after the enactment of the Federal Employers' Liability Act, necessarily consented to such suit as was authorized by the Act).

Since College Savings, a state's mere participation in a federally regulated activity no longer may be understood as a constructive waiver of state sovereign immunity and consent to suit in federal court. Congress no longer may statutorily coerce a state into relinquishing its sovereign immunity on threat of the state being excluded from participating in an otherwise lawful and permissible activity. See College Savings, 527 U.S. at 687; see also id. at 683 ("Recognizing a congressional power to exact constructive waivers of sovereign immunity through the exercise of Article I powers would also, as a practical matter, permit Congress to circumvent the antiabrogation holding of Seminole Tribe.").

But the College Savings Court distinguished and left intact conditional types of constructive waiver as previously established in two cases. In Petty v. Missouri Bridge Comm'n, 359 U.S. 275, 277-78 (1959), two states entered into an interstate compact, approved by Congress, that contained a sue-or-be-sued clause. The Court held that the states assumed the conditions, such as consent to suit, that Congress attached to the compact by accepting the conditions and acting on the compact containing those conditions. See id. at 281-82. In South Dakota v. Dole, 483 U.S. 203, 208-09 (1987), the Court upheld a federal law, passed pursuant to the Spending Clause, U.S. Const. art. I, S 8, cl. 1, that conditioned a state's receipt of federal highway funds on the establishment of a minimum drinking age of 21 in the state; the Court found that the condition on the funds was clearly stated and that

16

acceptance of the funds entailed agreement to those conditions.

The College Savings Court described these cases as "fundamentally different" from Parden-type forced constructive waivers because both the grant of consent to form an interstate compact and the disbursement of federal monies are congressionally bestowed gifts or gratuities, which Congress is under no obligation to make, which a state is not otherwise entitled to receive, and to which Congress can attach whatever conditions it chooses. See College Savings, 527 U.S. at 686-87. A waiver in return for receiving a benefit which a state could not otherwise enjoy is very different from a situation, such as in College Savings or Parden, where a state's refusal to consent to the condition of being sued would result in a congressionally imposed sanction, i.e., the exclusion of the state from activities in which it otherwise was legally permitted to engage.

A fair reading of College Savings suggests that Congress may, pursuant to its regulatory power under the Commerce Clause, require a state to waive immunity in order to engage in an activity in which the state may not engage absent congressional approval, or in order to receive a benefit to which the state is not entitled absent a grant or gift from Congress. Four of our sister circuits have adopted this understanding of College Savings, recognizing that "gift" or "gratuity" waivers are permissible under a law passed pursuant to Article I powers, provided that Congress made its intent to require a waiver of immunity clear and unambiguous. See Bell Atl. Md., Inc. v. MCI Worldcom, Inc., 240 F.3d 279, 292 (4th Cir.) (recognizing congressional power to impose gift waiver, so long as its intent to do so is clear), cert. granted in part, 121 S. Ct. 2548 (2001); Bellsouth, supra, 238 F.3d at 645 (5th Cir.) ("[A]fter College Savings, Congress may still obtain a non-verbal voluntary waiver of a state's Eleventh Amendment immunity if the waiver can be inferred from the state's conduct in accepting a gratuity after being given clear and unambiguous statutory notice that it was conditioned on waiver of immunity."); MCI, supra, 222 F.3d at 339-40 (7th Cir.) (holding that College Savings set boundaries on

17

congressional attempts to obtain waivers from states but that it endorsed certain types of waivers, such as in Dole and Petty); id. at 344 ("We believe that College Savings does not alter the principle that states may waive their immunity by accepting a benefit from Congress that has conditions attached to that acceptance."); MCI Telecomm. Corp. v. Public Serv. Comm'n of Utah, 216 F.3d 929, 937 (10th Cir. 2000) (Public Serv. Comm'n of Utah) (reading College Savings as permitting constructive waivers that are voluntary, meaning waivers given in order to obtain a gift or gratuity that would be denied if the state refuses to consent to suit in federal court), cert. denied, 121 S. Ct. 1167 (2001).

Congress must be unmistakably clear and unambiguous in stating its intent to condition receipt of the gratuity on the state's consent to waive its sovereign immunity and to be sued in federal court. See Atascadero State Hosp., 473 U.S. at 247. This requirement that Congress speak with a "clear voice" ensures that the states exercise their choice knowingly and voluntarily, cognizant of the consequence (waiver of constitutional immunity) of participating in the permitted activity. See Pennhurst State Sch. and Hosp. v. Halderman, 451 U.S. 1, 17 (1981) (Pennhurst I).

The third exception to the Eleventh Amendment is the doctrine of Ex Parte Young, 209 U.S. 123 (1908), under which individual state officers can be sued in their individual capacities for prospective injunctive and declaratory relief to end continuing or ongoing violations of federal law. In Young, the Supreme Court held that the Eleventh Amendment did not prohibit a federal court from enjoining a state attorney general from enforcing an unconstitutional state law. The theory behind Young is that a suit to halt the enforcement of a state law in conflict with the federal constitution is an action against the individual officer charged with that enforcement and ceases to be an action against the state to which sovereign immunity extends; the officer is stripped of his official or representative character and becomes subject to the consequences of his individual conduct. See Young, 209 U.S. at 159-60; see also Pennhurst State Sch. and Hosp. v. Halderman, 465 U.S. 89, 103 (1984) (Pennhurst II) (stating

18

that, under the theory of Young, an action for prospective relief against the state officer was not an action against the state because the allegation of a violation of federal law would strip the officer of his official authority). The relief sought must be prospective, declaratory, or injunctive relief governing an officer's future conduct and cannot be retrospective, such as money damages. See Pennhurst II, 465 U.S. at 102-03.

The Young doctrine is accepted as necessary to permit federal courts to vindicate federal rights and to hold state officials responsible to the "supreme authority of the United States." See id. at 105. The doctrine applies both to violations of the United States Constitution and to violations of federal statutes. See Balgowan v. New Jersey, 115 F.3d 214, 218 (3d Cir. 1997) (holding that suit for declaratory relief against state officer under Fair Labor Standards Act is permissible under Young); see also Allegheny County Sanitary Auth. v. U.S.E.P.A., 732 F.2d 1167, 1174 (3d Cir. 1984). However, Young does not apply if, although the action is nominally against individual officers, the state is the real, substantial party in interest and the suit in fact is against the state. See Pennhurst II, 465 U.S. at 101.

Some confusion has arisen as to the scope and application of Young as a result of the Supreme Court's recent decision in Coeur d'Alene. There, an Indian tribe brought suit against Idaho state officers arguing that, under federal law, the Tribe should hold title to the banks, bed, and submerged lands of Lake Coeur d'Alene and the various navigable rivers and streams forming part of its waterway. See Coeur d'Alene, 521 U.S. at 264. A five-Justice majority concluded that Young did not permit the action because the Tribe's suit, although brought against individual officers for prospective relief from an ongoing violation of federal law, was the functional equivalent of a quiet title action against the state, which, if successful, would divest the state of title and sovereign control over the waters and submerged lands. See id. at 283. Submerged land beneath navigable waters has a unique status in law and is infused with a public trust; state ownership of such lands has been "considered an essential attribute of

19

sovereignty." See id. (citations and internal quotation marks omitted); id. at 287–88 (emphasizing the ties between the waters and submerged lands and the state's own dignity and sovereignty and the severance and diminishment of that sovereignty were prospective relief to be granted); id. at 296 (O'Connor, J., concurring in part and concurring in the judgment) ("Where a plaintiff seeks to divest the State of all regulatory power over submerged lands––in effect, to invoke a federal court's jurisdiction to quiet title to sovereign lands ––it simply cannot be said that the suit is not a suit against the State.").

The principal opinion in Coeur d'Alene, authored by Justice Kennedy, garnered five votes in its determination that the Tribe's action was equivalent to a quiet title action against the state itself and was barred by the Eleventh Amendment. Justice Kennedy's opinion also suggested, however, that Young is not applicable to every case in which prospective relief is sought against an individual officer from an ongoing violation of federal law. See 521 U.S. at 270 (describing that view as adhering to an "empty formalism" and undermining the real limits imposed by the Eleventh Amendment). Rather, Justice Kennedy suggested that Young applies primarily in two instances: where there is no state forum available to vindicate federal rights, see id., and where the case calls for the interpretation of federal law. See id. at 274. Justice Kennedy urged that there always be a careful balancing and accommodation of federal and broad state interests when determining whether Young applies, applying a case–by–case balancing approach. See id. at 278.

The portion of Justice Kennedy's opinion adopting this narrowed view of Young was joined only by the Chief Justice. In a separate opinion, Justice O'Connor, joined by Justices Scalia and Thomas, sharply criticized the replacement of a "straightforward inquiry into whether a complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective with a vague balancing test that purports to account for a `broad' range of factors." Id. at 296 (O'Connor, J., concurring in part and concurring in the judgment); see id. at 291 (criticizing the principal opinion as unnecessarily narrowing

20

Young without warrant); id. at 296–97 ("I would not narrow our Young doctrine."); see also id. at 297–98 (Souter, J., dissenting) (stating that Justice O'Connor had rejected the call for case–by–case balancing in applying Young and expressing "great satisfaction" that this view is the controlling one).

Justice Kennedy's opinion in Coeur d'Alene cannot be read to establish the controlling standard for Young. Seven Justices rejected such a balancing and agreed that Young generally should apply when an action against a state officer alleges an ongoing violation of federal law and seeks prospective relief. See id. at 296 (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in the judgment); id. at 298–99 (Souter, J., joined by Stevens, Ginsburg, and Breyer, JJ., dissenting). The Fifth Circuit has held that, because a majority of the Supreme Court would adhere to the more traditional application of Young, the Fifth Circuit would also continue to do so. See Bellsouth, 238 F.3d at 648–49 (quoting Earles v. State Bd. of Certified Pub. Accountants of Louisiana, 139 F.3d 1033, 1039 (5th Cir. 1998)). We agree and similarly hold that Young continues to permit actions against state officers for prospective relief from ongoing violations of federal law; no case–by–case balancing is necessary or proper.

Coeur d'Alene did carve out one narrow exception to Young: An action cannot be maintained under Young in those unique and special circumstances in which the suit against the state officer affects a unique or essential attribute of state sovereignty, such that the action must be understood as one against the state. One example of such special, essential, or fundamental sovereignty is a state's title, control, possession, and ownership of water and land, which is equivalent to its control over funds of the state treasury. See Coeur d'Alene, 521 U.S. at 287; id. at 296–97 (O'Connor, J., concurring in part and concurring in the judgment). This exception is best understood as an application of the general rule that Young does not permit actions that, although nominally against state officials, in reality are against the state itself. See Pennhurst II, 465 U.S. at 102.

21

In addition, the Court in Seminole Tribe has carved out a second exception to Young. Young will not apply where Congress has created a detailed remedial scheme for the enforcement of a federal statutory right against a state. See Seminole Tribe, 517 U.S. at 74. The statute at issue in Seminole Tribe was the Indian Gaming Regulation Act (IGRA), under which Congress established a limited set of remedies and detailed, elaborate procedures for obtaining those remedies. Pursuant to IGRA, the state was under an obligation to negotiate with a tribe in good faith and if a court found that the tribe had failed to do so, the sole remedy was for a court to order the state and the tribe to conclude a compact within 60 days. See id. If the parties did not complete the compact within that time, the sole sanction was that each party was to present a proposed compact to a mediator, who would choose the compact best embodying federal law. See id. If the state still failed to comply, the tribe was to notify the Secretary of the Interior, who would prescribe regulations. See id. at 74-75. This limited remedy contrasted with the full panoply of prospective judicial remedies available in an action against individual officers under Young, including contempt sanctions for violation of an injunction. See id. at 75. Where, as in IGRA, Congress has created such a detailed and limited remedial scheme in the statute itself, a federal court cannot obtain jurisdiction through Young over an action against state officers which seeks a remedy beyond that which Congress itself has made available against the state under federal law.

B. The Eleventh Amendment and S 252(e)(6)

With this overview of the Eleventh Amendment in mind, we turn to the question whether S 252(e)(6), providing for federal court review of an interconnection agreement approved by a state utility commission, violates the PUC's and the Commissioners' Eleventh Amendment sovereign immunity. We are not the first court of appeals to address this question. The Fifth, Seventh, and Tenth Circuits have all concluded that S 252(e)(6) does not violate the Eleventh Amendment, both because the state utility commissions knowingly and voluntarily waived immunity by accepting

22

the congressionally bestowed gratuity of participating in the process of approving interconnection agreements, fully aware that they would be subject to suit under S 252(e)(6), and because Young permits suits for prospective relief against individual commissioners. See Bellsouth , supra, 238 F.3d 636 (5th Cir.); MCI, supra, 222 F.3d 323 (7th Cir.); Public Serv. Comm'n, supra, 216 F.3d 929 (10th Cir.). The Sixth Circuit also held that a S 252(e)(6) action was not barred, relying solely on Young. See Michigan Bell Tel. v. Climax Tel. Co., 202 F.3d 862 (6th Cir.), cert. denied, 121 S. Ct. 54 (2000). Only the Fourth Circuit, over a dissent, has reached a different conclusion, holding that actions against state commissions and commissioners are barred by the Eleventh Amendment. See Bell Atl. Md., 240 F.3d 279 (4th Cir.); see also Bellsouth Telecomm., Inc. v. North Carolina Util. Comm'n, 240 F.3d 270 (4th Cir. 2001) (same result in companion case).4

1. Waiver

We will first consider whether the Telecommunications Act of 1996, by taking control of local telephone companies away from the states and then giving back to them the option of participating in local telecommunications regulation, has established the type of gratuity or gift waiver of Eleventh Amendment immunity that the College Savings Court recognized as permitted under Commerce Clause powers. We must answer two questions: 1) whether

_____

4. The Supreme Court has granted certiorari on both parts of the sovereign immunity question in Bell Atl. Md. and also in a case from the Seventh Circuit, Mathias v. Worldcom Tech., Inc. , 121 S. Ct. 1224 (2001). The cases have been consolidated for oral argument. We have determined, however, that we should resolve the legal issues before us and not await the Supreme Court's decision on sovereign immunity. The reason we do so is consistent with the purpose of the 1996 Act –- to establish competition in local telephone service as quickly and expeditiously as possible. We cannot reach the merits of our appeals until we have resolved the issue of sovereign immunity. If we do resolve that issue, even if our conclusion is ultimately overturned, our decision on the merits will still assist the parties in their efforts to establish interconnection agreements. For that reason, and because we have persuasive precedent to follow, we have decided to move forward.

the authority to participate in the regulatory scheme is in fact a gift or gratuity to which Congress may attach as a condition the state's agreement to waive sovereign immunity and be sued in federal court and 2) whether Congress in the statute made clear, explicit, and unambiguous its intent that state utility commissions participating in the regulatory process would subject themselves to suit in federal court, so that the states can be said to have knowingly and voluntarily waived sovereign immunity by participating in that process.

(a)

We conclude that under the Act the authority to regulate local telecommunications is a gratuity to which Congress may attach conditions, including a waiver of immunity to suit in federal court. Thus, the submission to suit in federal court, provided for in S 252(e)(6), is valid as a waiver, conditioned on the acceptance of a gratuity or gift, as permitted by College Savings.

We find a gratuity because, with the 1996 Act, Congress federalized the regulation of competition for local telecommunications service. The Act preempted the regulation of interconnection agreements and of the terms on which a CLEC can provide competitive local service. Local telephone service had previously been a monopoly service within the exclusive regulatory province of the states. See Iowa Utils. I, 525 U.S. at 370. The 1996 Act fundamentally restructured local service by requiring competition and establishing the mechanisms by which competing carriers may enter the market. See id. The Act, passed pursuant to Congress's power over interstate commerce (which is plenary, see Oregon Waste Sys., Inc. v. Department of Envtl. Quality of State of Or., 511 U.S. 93, 98 (1994)), validly preempted state regulation over competition to provide local telecommunications service. See Iowa Utils. I, 525 U.S. at 378 n.6 (stating that Congress "unquestionably" took the regulation of local telecommunications competition away from the states); see also Bellsouth, 238 F.3d at 646; MCI, 222 F.3d at 343; Public Serv. Comm'n, 216 F.3d at 938.

24

Congress could have made that preemption complete. It could have entirely eliminated any state role in regulating local competition and in conducting arbitration, review and approval of interconnection agreements, and it could have reserved to the FCC all such review and regulation. See Bellsouth, 238 F.3d at 646; MCI, 222 F.3d at 342; Bell Atl. Md., 240 F.3d at 316 (King, J., dissenting); see also FERC v. Mississippi, 456 U.S. 742, 764 (1982) ("[T]he commerce power permits Congress to preempt the States entirely in the regulation of private utilities."). Congress instead preserved a role for state utility commissions in the federal regulatory scheme, giving them back some regulatory power by allowing them the first opportunity to conduct arbitrations and to approve or reject interconnection agreements. See 47 U.S.C. S 252(b)(1); 47 U.S.C. S 252(e)(1), (e)(2), (e)(4).

Because Congress validly terminated the states' role in regulating local telephone competition and, having done so, then permitted the states to resume a role in that process, the resumption of that role by a state is a congressionally bestowed gratuity. The state commission's authority to regulate comes from S 252(b) and (e), not from its own sovereign authority. See MCI, 222 F.3d at 343. Regulating local telecommunications competition under the 1996 Act no longer is, in the words of College Savings , an "otherwise lawful" or "otherwise permissible" activity for a state. Rather, it is an activity in which states and state commissions are not entitled to engage except by the express leave of Congress.

Indeed, the "states are not merely acting in an area regulated by Congress; they are now voluntarily regulating on behalf of Congress." MCI, 222 F.3d at 343; see Bellsouth, 238 F.3d at 647 (stating that the state "accepted Congress's offer under the 1996 Act to delegate federal authority to the state commission"); Public Serv. Comm'n, 216 F.3d at 938 (stating that the Act "invites states to participate in the federal government's regulation of local telephone service"). Because this opportunity for the states to exercise federal power is a gratuity from Congress, Congress may then attach to that grant of regulatory power any conditions it chooses. The condition which it did attach was the

25

submission to suit in federal court. Thus, when a state accepts that grant of regulatory power, it does so under the condition that it be subject to suit in federal court. See MCI, 222 F.3d at 344 n.10 ("By accepting the grant of regulatory power offered by Congress, and by allowing the state commission to exercise that power, [the states] cannot contend now that they are not bound by the conditions attached to that grant of power.").

The PUC contends, however, that the power to regulate local telephone service is not a congressional gratuity but a primary aspect of core state sovereignty, a power the states have exercised exclusively for decades. This argument ignores the fundamental restructuring of telecommunications markets worked by the 1996 Act, see Iowa Utils. I, 525 U.S. at 370. Through the Act's restructuring, the federal government has "unquestionably" taken the regulation of local telecommunications competition away from the states. See id. at 378 n.6. Whatever the power of the states in the area of local telephone regulation prior to 1996, that power did not survive passage of the Act. State commissions now exercise power over local competition only pursuant to S 252(e) and only to the extent and in the manner provided by Congress.

The fact that the PUC was required under pre-1996 state law to regulate local telephone service and that the pre-1996 law has not been repealed by the Pennsylvania legislature does not mean that the present participation by the PUC in regulation is not voluntary. The relationship between the state and the state utility commission under state law is irrelevant to the Eleventh Amendment analysis. If the state's participation in the federal scheme is voluntary, then its delegated commission's participation is also voluntary. And, as a result of the federal preemption, resulting from the Act, the decision by a state to regulate competition in the provision of local telecommunications service is a voluntary one. When, therefore, the state directs the state commission to participate in regulation under the Act, the commission's participation is also voluntary.

Moreover, a state's participation in telecommunications regulation is not mandatory. If a state commission declines or fails to participate in arbitration or review of

26

interconnection agreements, responsibility for regulation falls to the FCC. See 47 C.F.R. SS 51.803-807. There is no requirement or obligation in federal law that a state participate in this regulation.5 A state or state commission's decision not to act is not subject to review. See 47 U.S.C. S 252(e)(6) (providing that an aggrieved party's only remedy if the state commission fails to act is to pursue its challenge to the agreement with the FCC). The state commission is "free to accept or reject such participation as a gratuity without abstaining from any lawful activity within its power." See Bellsouth, 238 F.3d at 647. A state or state commission wishing to preserve its Eleventh Amendment immunity may simply decline the invitation to regulate local competition on behalf of the federal government and allow that power to return to the FCC. Indeed, the state commission in Virginia has declined to resolve petitions to interpret and enforce interconnection agreements and the FCC has stepped in to exercise regulatory responsibility in Virginia. See FCC Order, In the Matter of Starpower Communications, LLC Petition for Preemption of Jurisdiction of the Virginia State Corporation Commission Pursuant to Section 252(3)(5) of the 1996 Act, CC Docket No. 00-52 (June 14, 2000).

If the Commonwealth of Pennsylvania continues to direct the PUC to perform these regulatory functions, however, this decision by the Commonwealth, as delegated to the PUC, is a voluntary decision. See MCI, 222 F.3d at 344 n.10.

(b)

Even though we have concluded that the right to participate in the regulation of local telecommunications competition is a gratuity or benefit bestowed on the states by Congress, we must still determine whether Congress was unmistakably explicit, clear, and unambiguous inS 252(e)

_____

5. This voluntariness is critical. Because the state commissions are given a choice whether to participate in federal regulation, the Act cannot be said impermissibly to "commandeer" state regulatory agencies to enforce federal law. See MCI, 222 F.3d at 343 (citing Printz v. United States, 521 U.S. 898, 935 (1997)).

27

in providing that a state utility commission's determination, approving interconnection agreements affecting local telecommunications competition, would be subject to review in federal court.

In considering whether S 252(e) is explicit, clear, and unambiguous, we look to its language and to the language of the Act as a whole. The regulatory process begins with negotiations by an ILEC and a CLEC to form an interconnection agreement. The Act provides that such an agreement, whether adopted through negotiation or arbitration, is submitted to the state utility commission, which reviews the agreement for consistency with the Act and the public interest and which approves or rejects the agreement. See 47 U.S.C. S 252(e)(1). The commission is also the first body to which carriers turn for arbitration if negotiations are unsuccessful or if issues remain unresolved. See 47 U.S.C. S 252(b)(1). The Act then provides that, when the state commission has made a determination on the agreement, "any party aggrieved by such determination may bring an action in an appropriate Federal district court," challenging whether the agreement meets the requirements of SS 251 and 252. See 47 U.S.C. S 252(e)(6). In other words, S 252(e)(6) specifically provides for "actions" in federal court brought by"aggrieved" parties to review "agreements" and "statements" approved by state utility commissions. Moreover, S 252(e)(4) provides that "[n]o State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section." See 47 U.S.C. S 252(e)(4). Federal jurisdiction for the review of commission decisions on interconnection agreements is exclusive.

Consequently, a state commission that decides to participate in this statutory scheme is on notice from the outset that it will be subject to suit, brought only in federal court, by any party aggrieved by its decision. See MCI, 222 F.3d at 337 (stating that SS 252(e)(4) and 252(e)(6), read together, indicate "that Congress envisioned suits reviewing `actions' by state commissions" and that "Congress intended that such suits be brought exclusively in federal court."). The statutory language places the state utility commission on notice that, by choosing to act on an

28

interconnection agreement and to make a decision as to its legality, it submits itself to the jurisdiction of the federal courts.

We agree with our sister circuits that this language constitutes a sufficiently clear congressional statement that a state will and must waive its sovereign immunity when it acts to regulate local competition agreements. See Bellsouth, 238 F.3d at 646; MCI, 222 F.3d at 341 ("[T]he 1996 Telecommunications Act satisfies the requirement that Congress clearly state that participation by the state in the regulatory scheme entails a waiver of immunity from suit in federal court."); Public Serv. Comm'n , 216 F.3d at 938 ("[Section] 252 puts Utah on notice that Congress intends to subject it to suits brought by individuals if it acts under S 252."); see also Bell Atl. Md., 240 F.3d at 314 (King, J., dissenting) (arguing that the provisions of the Act "clearly show Congress's intent to subject participating states to suits in federal court"); but see Bell Atl. Md., 240 F.3d at 292 (holding that Congress did not clearly manifest an intent to condition state commissions' participation in the regulatory scheme on a waiver of sovereign immunity).

Moreover, a state commission is not obligated to waive sovereign immunity by participating in the regulatory process. The Act clearly provides that, if a state does not respond to a request to mediate or to arbitrate an interconnection agreement, the FCC is to assume that responsibility. For that reason, state participation in the regulation of local telecommunications competition is a choice, not a mandate.

It is true that the Act does not include magic words such as "waiver" or "immunity" or "suit." The Act became effective in 1996, prior to the Supreme Court's decision in Seminole Tribe that Congress may not abrogate Eleventh Amendment immunity under the Commerce Clause and prior to the decision in College Savings overturning the constructive waiver doctrine of Parden. Perhaps, were Congress drafting the statute in 2001 with Seminole Tribe and College Savings in the mix, it would have been more explicit than it was. We believe, however, that the language that Congress did use is sufficiently clear to establish that a state commission's decision will be subject to review in an

action brought in federal court by an aggrieved party and sufficiently clear that the commission may be made a party to that federal court action.

The argument is made in Bell Atl. Md. that the statute merely puts states on notice that their decisions will be subject to judicial review in federal court but that "it is a leap of logic to infer from this consent to federal-court review a consent by a State commission itself to be made a party to that federal review." 240 F.3d at 293; id. at 290. However, as the dissent in Bell Atl. Md. aptly states, consent to federal court review of a decision "necessarily entails" being made a party to the action. There is in fact no "leap of logic" from consent by a state commission to having its decision reviewed to consent by a state commission to being a party to that review. See id. at 314 (King, J., dissenting). We agree that "by allowing State commissions to substitute as regulators for the FCC, Congress obviously intended that State commissions, just like the FCC, be made parties to federal court actions challenging their decisions." Id. at 315 (King, J., dissenting); see MCI, 222 F.3d at 337 (holding that the language of S 252(e) shows Congress's intent that state commissions be parties to the federal-court suits reviewing their decisions in the same way that the FCC is a party to the federal-court suits reviewing its actions).

We hold therefore, along with the Fifth, Seventh, and Tenth Circuits, that the PUC is subject to suit in federal court under the 1996 Act because the PUC knowingly waived its Eleventh Amendment immunity by voluntarily accepting the congressional gift or gratuity of the power to regulate local telecommunications competition under the Act. The District Court had jurisdiction over the PUC and we affirm the court's rejection of the PUC's Eleventh Amendment arguments.

2. Ex Parte Young

In the alternative, we hold that the action against the individual PUC Commissioners is not barred by the Eleventh Amendment because the case presents, in the Sixth Circuit's terms, "a straightforward Ex Parte Young

30

case." Michigan Bell, 202 F.3d at 867. The Fifth, Seventh, and Tenth Circuit have all agreed. See Bellsouth , 238 F.3d at 647 (5th Cir.) (stating that the Act presents a straightforward application of Young); MCI, 222 F.3d at 345 (7th Cir.) (holding that Eleventh Amendment does not bar telecommunications carriers from pursuing injunctive relief against individual members of state utility commissions); Public Serv. Comm'n, 216 F.3d at 939 (10th Cir.) (holding that telephone carrier could proceed against individual Commissioners); see also Bell Atl. Md., 240 F.3d at 317 (King, J., dissenting) (agreeing with other circuits that suit under S 252(e)(6) was straightforward Young case); but see Bell Atl. Md., 240 F.3d at 294-95 (4th Cir.) (holding that Young did not permit suit against individual Commissioners).

Application of Young here is, indeed, straightforward. As discussed in Part III A supra, we continue to view Young as generally applicable any time a plaintiff seeks prospective relief against individual state officers from an ongoing violation of federal law. See Coeur d'Alene, 521 U.S. at 296 (O'Connor, J., concurring in part and concurring in the judgment); see also Bellsouth, 238 F.3d at 648-49.

Worldcom, AT&T, and Verizon all allege that various terms, rates, and conditions contained in the interconnection agreement established and approved by the PUC are inconsistent with and violative of the requirements of SS 251 and 252. Those terms and conditions govern and will continue to govern the current and future relations among the telephone carriers and the establishment of local competition in Pennsylvania by the parties to the agreement. The PUC (acting through the individual commissioners) is charged not only with establishing those original terms but also with overseeing the implementation and enforcement of the interconnection agreement against the parties.

If the terms of the approved interconnection agreement do violate the Act, that violation constitutes an ongoing violation of federal law. The Commissioners individually are parties to the suit. The carriers seek prospective relief in a declaration that certain provisions of the approved interconnection agreement violate the Act and in an

31

injunction prohibiting enforcement of the agreement and requiring the PUC to establish different, more appropriate rates, terms, and conditions. This is the paradigmatic Young framework. See Bellsouth, 238 F.3d at 647; MCI, 222 F.3d at 345; Public Serv. Comm'n, 216 F.3d at 939; Michigan Bell, 202 F.3d at 867.

The Fourth Circuit is the only court of appeals to reach a different conclusion on the application of Young to the 1996 Act. The majority there relied on Justice Kennedy's case-by-case balancing theory, set out by him in Coeur d'Alene, by which the federal interests served by permitting the suit against the Commissioners are balanced against the important values of state sovereignty. See Bell Atl. Md., 240 F.3d at 295. The Fourth Circuit concluded that the federal interest in federal review could not overcome the "affront to the sovereignty" of the state in being brought before a federal court to defend a decision made when acting within the scope of its regulatory authority. See id. at 295, 298. As stated in Part III A, however, we have rejected the use of such a balancing approach to Young. We therefore decline to follow the decision in Bell Atl. Md.

Moreover, we conclude that neither of the two recognized exceptions to Young bars the instant action. First, the "special sovereignty interests" exception, acknowledged by the majority of justices in Coeur d'Alene, is not implicated. The ability of a state to make and carry out its regulatory decisions, which would be interrupted by a federal court injunction and declaration that the decision of the PUC Commissioners violated federal law, cannot be viewed as a core or fundamental matter of state sovereignty comparable to the ability of a state to maintain ownership of and title to its submerged lands. See MCI, 222 F.3d at 348. Any sovereign interest that the Commonwealth might have in regulating local telephone competition exists solely by virtue of the role that Congress bestowed upon the states in S 252(e); the state interest in regulating in this area no longer derives from its general sovereign powers. See id. Thus, an action against the individual Commissioners no longer affects these general sovereign powers.

Second, the Seminole Tribe exception for a detailed and limited remedial scheme is inapplicable. An aggrieved party

32

"may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements" of the Act. See 47 U.S.C. S 252(e)(6). The Act places no restrictions on the scope of the court's review or on the remedies it may impose. It places no restrictions on the form and nature of prospective relief that an aggrieved party may obtain. The relief available in an action under S 252(e)(6) is precisely the relief that would be available through a Young action -- the full panoply of declaratory and injunctive remedies. See Bell Atl. Md., 240 F.3d at 318 (King, J., dissenting) (quoting Bell-Atl.- Delaware, Inc. v. Global Naps South, Inc., 77 F. Supp. 2d 492, 501 (D. Del. 1999)).

We hold, consistent with the Fifth, Sixth, Seventh, and Tenth Circuits, that this action may go forward against the individual PUC Commissioners under Ex Parte Young because the carriers seek prospective relief against the individual Commissioners to stop an ongoing violation of federal law. We will affirm the District Court on this alternative ground.

IV. Verizon and PUC Appeals of the Merits

The District Court addressed and resolved several challenges, raised by Worldcom (supported by intervenor AT&T) and by Verizon, to various terms, rates, and conditions contained in the Worldcom/Verizon interconnection agreement. Five such merits issues are before us on separate, consolidated appeals by the PUC and Verizon.

A. Standard of Review

Before considering the merits of these issues, we must determine our standard of review. The District Court resolved the telecommunications challenges on summary judgment and our review of the District Court is plenary. See Ideal Dairy Farms, Inc. v. John LaBatt, Inc., 90 F.3d 737, 743 (3d Cir. 1996). The more difficult question is the proper standard for reviewing the PUC's determinations as established in arbitration and contained in the approved interconnection agreement. Section 252(e)(6) provides for

33

judicial review and a determination whether the approved agreement "meets the requirements" of the Act, see 47 U.S.C. S 252(e)(6), but does not prescribe the standard for that review. The District Court reviewed the PUC's interpretations of federal law de novo and its factual determinations under the arbitrary and capricious standard.

The PUC argues that its interpretations of federal law contained in the interconnection agreement are entitled to deference under Chevron USA, Inc. v. National Resources Defense Council, Inc., 467 U.S. 837, 843-44 (1984), pursuant to which the construction of a federal statute by a federal agency is accorded deference by reviewing courts when there has been an explicit or implicit delegation of authority to an agency to fill a gap in the statute and the agency interpretation is a reasonable one. Chevron deference is warranted when the agency was given the power to make rules carrying the force of law and when the interpretation at issue was promulgated in the exercise of that authority. See United States v. Mead Corp. , 121 S. Ct. 2164, 2171 (2001). Delegation may be shown by the grant to an agency of power to engage in adjudication or notice-and-comment rulemaking. See id. at 2172.

Generally, however, such deference is accorded to the interpretations of federal statutes by federal administrative agencies, not to interpretations by state agencies. See GTE South, 199 F.3d at 745 (quoting Orthopaedic Hosp. v. Belshe, 103 F.3d 1491, 1495-96 (9th Cir. 1997)). The PUC argues for an exception to this general rule, given the unique structure of the Act by which Congress delegated federal regulatory power to state utility commissions and the commissions exercise federal power that the FCC otherwise would exercise.

The PUC argues that its interpretations of federal law, made in reviewing and approving interconnection agreements, should be entitled to the same deference as would the FCC's interpretations if the FCC were primarily responsible for reviewing the agreements. Arguably, the state commissions do possess the same institutional competence as the FCC to make such decisions in the area of telecommunications law. See Philip J. Weiser, Chevron,

34

Cooperative Federalism, and Telecommunications Reform, 52 Vand. L. Rev. 1, 22-23 (1999). If the state commissions enjoy the confidence of Congress, they (and their interpretations of federal law) should enjoy similar confidence from the federal courts. See id. at 36. We reject this argument, however, and instead join the Ninth and Fourth Circuits in holding that a state utility commission's interpretations of the Act are reviewed de novo , not under Chevron, because the state commissions are not federal agencies to which deference is due. See MCI v. U.S. West, 204 F.3d at 1266; GTE South, 199 F.3d at 745.

Under the Act, there has been no delegation to state commissions of the power to fill gaps in the statute through binding rulemaking. See Mead, 121 S. Ct. at 2171. The power to promulgate binding regulations to implement the requirements of the Act and to fill statutory gaps was granted to the FCC, see 47 U.S.C. S 251(d)(1), and those regulations are entitled to deference. See Mead , 121 S. Ct. at 2172 (stating that a good indicator of delegation meriting Chevron deference is an express congressional authorization for an agency to engage in the rulemaking process); see also Iowa Utils. II, 219 F.3d at 748-49 (according Chevron deference to FCC rate regulations promulgated pursuant to S 251(d)(1)). State commissions have been given only the power to resolve issues in arbitration and to approve or reject interconnection agreements, not to issue rulings having the force of law beyond the relationship of the parties to the agreement.

In fact, deference to the state commissions would often be impossible, given the explicit delegation of rulemaking authority to the FCC in S 251(d)(1). The interconnection agreement must comply with the Act and with FCC regulations; if the approved agreement, containing the state commission's interpretations of the law, conflicts with the legal interpretations in the FCC regulations, the FCC interpretation must control under the Supremacy Clause and under the plain language of the Act. If, therefore, the PUC's interpretation conflicts with that of the FCC, the PUC's determination must be struck down.

Our conclusion not to accord deference to a state commission's interpretation of the Act is enforced by the

Supreme Court's recent decision in Mead which suggests that not every formal agency act involving interpretation of a federal statute is entitled to deference. See Mead, 121 S. Ct. at 2173 (holding that classification rulings by Customs Service not entitled to Chevron deference).

We will, therefore, review any PUC legal interpretations contained in the arbitration and interconnection agreement de novo. We will review factual findings under a substantial evidence standard. See MCI v. U.S. West, 204 F.3d at 1267; GTE South, 199 F.3d at 745. Under the substantial evidence test, we must uphold a decision that has "substantial support in the record as a whole." See GTE South, 199 F.3d at 746 (citations omitted).

B. Terms of the Interconnection Agreement

1. Interconnection in Access Tandem Serving Areas

The first merits issue we must consider is the PUC's requirement that Worldcom interconnect in each access tandem serving area, even when there is more than one access tandem area within a single LATA. It is Worldcom's position that it need interconnect only once within each LATA.

The Act provides that a CLEC must be permitted to interconnect "at any technically feasible point within the carrier's network." 47 U.S.C. S 251(c)(2)(B). An ILEC that denies interconnection at a particular point must prove that interconnection at that point is not technically feasible. See 47 C.F.R. S 51.305(e). Generally, these provisions have been interpreted to permit a CLEC to have access at any point on the incumbent network where connection is technically feasible. See, e.g., U.S. West Communications v. AT&T Communications of the Pac. Northwest, Inc., 31 F. Supp. 2d 839, 852 (D. Or. 1998) (AT&T-Pac).

The instant case presents a twist on the usual situation. Verizon, as ILEC, is not attempting to deny Worldcom, as CLEC, access to the network at a particular point or points, nor is Verizon attempting to require that Worldcom interconnect at another point than the one at which

Worldcom chooses to interconnect. Rather, Verizon wants Worldcom to take access at several additional points in the network, to interconnect at multiple points within the LATA, even if Worldcom does not want to do so. The PUC and Verizon contend that, because the Act and the FCC regulations do not specify whether a CLEC may be required to interconnect at additional points or how many points of interconnection a CLEC may be required to have, the issue is left to the PUC's discretion.

To the degree that a state commission may have discretion in determining whether there will be one or more interconnection points within a LATA, the commission, in exercising that discretion, must keep in mind whether the cost of interconnecting at multiple points will be prohibitive, creating a bar to competition in the local service area. See AT&T-Pac., 31 F. Supp. 2d at 852. If only one interconnection is necessary, the requirement by the commission that there be additional connections at an unnecessary cost to the CLEC, would be inconsistent with the policy behind the Act.

Moreover, the fact that S 251(c)(2) permits the CLEC to choose the points in the network at which to interconnect suggests that the Act provides for a balanced resolution in the determination of interconnection points: While the ILEC cannot be required to allow interconnection at technically unfeasible points, similarly the CLEC cannot be required to interconnect at points where it has not requested to do so. If we accept this proposition, the PUC and Verizon cannot require Worldcom to interconnect at any point in the network at which Worldcom does not wish to interconnect.

The decision where to interconnect and where not to interconnect must be left to Worldcom, subject only to concerns of technical feasibility. Verizon has not presented evidence that it is not technically feasible for Worldcom to interconnect at only one point within a LATA. Nor has Verizon shown that it is technically necessary for Worldcom to interconnect at each access tandem serving area. The PUC's requirement that Worldcom interconnect at these additional points is not consistent with the Act. We will affirm the District Court's decision, rejecting the PUC's interconnection requirements. To the extent, however, that

37

Worldcom's decision on interconnection points may prove more expensive to Verizon, the PUC should consider shifting costs to Worldcom. See 11 F.C.C.R. 15499 P 209 (1996).

2. Remote Switching Modules

The PUC determined that Worldcom would be permitted to collocate RSMs in Verizon's offices. The District Court affirmed this portion of the interconnection agreement. This ruling was consistent with the original interpretation of the Act by the FCC. The Act provides that CLECs are permitted to collocate equipment "necessary for interconnection or access to unbundled network elements." 47 U.S.C. S 251(c)(6). At the outset, the FCC interpreted "necessary" to mean not indispensable, but "used or useful" for interconnection, regardless whether other equipment could be used to perform the same functions. See Local Competition Order P 579. The FCC found that this definition was most consistent with the pro-competitive purposes of the Act, as it permitted CLECs to interconnect with greater efficiency and at less cost. Id. The FCC further found that this definition applied regardless whether the equipment contained other functions, such as switching. See In the Matter of Deployment of Wireline Services Offering Advanced Telecommunications Capability, 14 F.C.C.R. 4761P 28 (1999) (Wireline Services Order); see also 47 C.F.R. S 51.323(c) (providing that ILECs may not place any limitations on the ability of CLECs to use all the features, functions, and capability of collocated equipment, including switching and routing features). An ILEC objecting to collocation of a piece of equipment was required to prove "that the equipment will not be actually used by the telecommunications carrier for the purpose of obtaining interconnection." 47 C.F.R. S 51.323(b). The ILEC also had to show that there were technical or space limitations proscribing collocation. 47 U.S.C. S 251(c)(6).

The D.C. Circuit, however, vacated P 28 of the Wireline Services Order and required the FCC to give a "better explanation" for the requirement that a CLEC be permitted to collocate equipment beyond that which is "necessary, required, or indispensable" to interconnection. GTE Serv.

38

Corp. v. FCC, 205 F.3d 416, 424 (D.C. Cir. 2000). The court held that the FCC's interpretation of "necessary" was too broad, particularly in that it would require collocation of any and all equipment that is used for interconnection, without regard to whether such equipment unnecessarily included other features, such as switching. Id.  The court rejected the FCC's consideration of cost savings and efficiency in broadening the meaning of "necessary," holding that such considerations had been rejected by the Supreme Court. Id. at 424 (citing Iowa Utils. I , 525 U.S. at 390).

The FCC has now reissued the collocation rules in the Collocation Remand Order, to take effect September 19, 2001. In the new Order, the FCC has declared that it will allow collocation of "dramatically smaller,""innovative equipment," including "remote switching modules, which are small switches that are used in conjunction with host switches located in different premises." Collocation Remand Order at PP 47 & n.133, 48. We conclude that under this new Order the PUC's ruling allowing collocation of RSMs was proper.

Moreover, both the Fourth and the Ninth Circuits have held that RSMs are used for interconnection and can be a necessary piece of equipment that an ILEC may be required to collocate. See U.S. West Communications, Inc. v. Hamilton, 224 F.3d 1049, 1056 (9th Cir. 2000); AT&T-Virginia, Inc. v. Bell Atl.-Virginia, Inc., 197 F.3d 663, 669 (4th Cir. 1999); see also MCI v. U.S. West, 204 F.3d at 1268-69 (holding, in action brought by ILEC, that provision of agreement requiring ILEC to permit collocation of remote switching units was not proscribed by the Act and was valid); AT&T-Pac., 31 F. Supp. 2d at 854 (upholding state utility commission decision requiring collocation of remote switching unit).

In choosing the equipment to be used for interconnection, Worldcom cannot be required to strip down its network to its bare essentials and to use equipment that performs only a single function, resulting in a less efficient and cost-effective network and, presumably, in higher consumer prices. Verizon's interpretation-- that equipment is not necessary for interconnection merely because it can perform other functions or because some

other equipment could be used instead -- is incompatible with the reissued Collocation Remand Order and with the policy behind the Act. We will therefore affirm the District Court's decision on collocation of RSMs.

3. Wholesale Rates

Verizon argues that the District Court erred in approving the wholesale rates to be charged to Worldcom for services to be resold under S 251(c)(4)(A). We agree with Verizon and will reverse the District Court's decision on this point.

The Act requires ILECs to "offer for resale at wholesale rates any telecommunications service that the [incumbent] carrier provides at retail to subscribers who are not telecommunications carriers." See 47 U.S.C. S 251(c)(4)(A). Wholesale rates are to be determined based on retail rates charged to subscribers, excluding "the portion thereof attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier." See 47 U.S.C. S 252(d)(3) (emphasis added). The FCC interpreted the pricing standard to be the retail rate, less "avoided retail costs," see 47 C.F.R.S 51.607; avoided retails costs are "those costs that reasonably can be avoided when an incumbent LEC provides a telecommunications service for resale at wholesale rates to a requesting carrier." See 47 C.F.R.S 51.609(b) (emphasis added). This is the standard that the PUC applied in setting the rates contained in the interconnection agreement.

The "reasonably can be avoided" standard was struck down by the Eighth Circuit as contrary to the Act. See Iowa Utils. II, 219 F.3d at 755-56.6 The court determined that the word "will" indicated certainty or actuality, meaning the statute excluded from the wholesale rates only those costs certainly and actually avoided in providing services to a CLEC for resale. See id. at 755. The Act recognizes that an ILEC will continue to provide its own retail telephone services to consumers and will continue to incur the

_____

6. Certiorari was not granted on this point. See Iowa Utils. II, 121 S. Ct.
878 (2001) (granting certiorari on 3 issues). That aspect of the Eighth Circuit's decision is final.

40

general costs of providing retail services. See id. The "reasonably can be avoided" standard would exclude from the wholesale rates all costs that could be associated with all provision of retail telephone services to all retail customers, regardless whether the ILEC is avoiding such costs in its sales to the CLEC. A standard based on "actually avoided" costs should, however, focus on the costs avoided in sales made to the CLEC, while recognizing that the ILEC will continue other retail sales. See id.

We agree with the Eighth Circuit that the wholesale rates must be based on the costs actually avoided by Verizon in its wholesale sales to Worldcom or to any other CLEC. A wholesale rate such as the one set by the PUC, based on costs that could be but were not actually avoided, is inconsistent with the language of the Act and cannot stand.

We conclude that the PUC erred in setting the wholesale rates for services sold to Worldcom for resale. We will remand this issue to the District Court with orders to remand to the PUC for a new determination of wholesale rates, applying whatever new rate standard the FCC promulgates on remand from Iowa Utils. II. 7

4. Directory Publishing Services

The PUC ordered Verizon to provide to Worldcom directory publishing services at wholesale prices. The District Court rejected the recommendation, vacating this portion of the agreement.

Verizon must offer at wholesale rates "any telecommunications service" to be resold by Worldcom. See 47 U.S.C. S 251(c)(4)(A). A telecommunications service is the "offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." See 47 U.S.C. S 153(46). Telecommunications means "transmission, between or among points specified by the user, of information of the user's choosing, without change

_____

7. MCI does not contest this result. It recognizes that the FCC will promulgate new wholesale pricing regulations and that the PUC will apply that standard on remand.

41

in the form or content of the information as sent and received." See 47 U.S.C. S 153(43). Directory publishing services include basic listings with customer telephone numbers, as well as additional services such as vanity numbers, bold and foreign listings in the White Pages, and non-listing and non-publication of customers' telephone numbers.

At issue is the price that Verizon may charge Worldcom for directory publishing services, which requires that we decide if directory publishing services are telecommunications services under the relevant statutory definitions. If they are, Verizon must charge wholesale rates. See 47 U.S.C. S 252(c)(4)(A). If they are not, Verizon may charge the tariffed rates. The District Court held that the statutory definitions could not be strained to include directory publishing services as telecommunications services. We agree.8

The PUC argues that it is undisputed that directory publishing services are retail tariff service offerings, that is, services offered by Verizon to retail customers at prices established in tariffs filed with the FCC or the PUC. While this perhaps is true, it is irrelevant. Section 251(c)(4) does not require the wholesale provision of all retail tariff services that an ILEC offers to subscribers, only the wholesale provision of telecommunications services. The two categories are not coextensive. All retail tariff services are not telecommunications services, given the limited definitions of S 153(43) and (46). Telecommunications services involve the offering of telecommunications, the transmission of information. Directory publishing services do not involve the transmission of information and do not fall within the statutory definitions.

_____

8. We have found no cases addressing whether directory publishing services fit within the definitions of telecommunications services. We have found cases holding that directory publishing services are network elements within the meaning of S 153(29) that must be sold at the cost-based rates of S 252(d)(1). See AT&T-Va. , 197 F.3d at 674-75; Bell-Atl.-Delaware, Inc. v. McMahon, 80 F. Supp. 2d 218, 251-52 (D. Del. 2000). These decisions, however, are not persuasive on the question of whether directory publishing services are telecommunications services, subject to a different statutory definition and a different pricing standard.

Verizon is not required to provide directory publishing services to Worldcom at wholesale prices for resale. It may provide such services at tariffed rates or at some other rates to be determined in a new interconnection agreement on remand to the PUC. We will therefore affirm the District Court on this issue.

5. Price of Unbundled Network Elements

The District Court held that the PUC's pricing model for the leasing of unbundled network elements did not use a forward-looking TELRIC pricing methodology, but an improper TSLRIC model. The court remanded the issue to the PUC to apply the proper pricing model. The District Court never addressed the PUC's actual application of its methodology or the details of the pricing decision that the PUC reached. We will vacate the District Court's decision and remand this issue to the District Court to review the details and substance, as opposed to the nomenclature, of the pricing model that the PUC used and the pricing decision it made.

The PUC must determine the "just and reasonable rate" to be charged for access to unbundled network elements, a rate that must be nondiscriminatory and "based on the cost . . . of providing the . . . network element," along with a reasonable profit for the ILEC. See 47 U.S.C. S 252(d)(1)(A), (B); Iowa Utils. II, 219 F.3d at 749. The FCC has promulgated regulations establishing the methodology for determining the rates to be charged. See Iowa Utils. I, 525 U.S. at 384-85 (holding that FCC has jurisdiction to design a pricing methodology).

The rate must be based on the forward-looking TELRIC of a discrete network element plus a "reasonable allocation of forward-looking common costs." See 47 C.F.R. S 515.505(a). TELRIC is the "forward-looking cost over the long run of the total quantity of the facilities and functions that are directly attributable to, or reasonably identifiable as incremental to, such element, calculated taking as a given the incumbent LEC's provision of other elements." See 47 C.F.R. S 51.505(b).

43

We note several points about the FCC pricing regulations. First, TELRIC "should be measured based on the use of the most efficient telecommunications technology currently available and the lowest cost network configuration, given the existing location of the incumbent LEC's wire centers." See 47 C.F.R. S 51.505(b)(1). Second, forward-looking costs are "economic costs efficiently incurred in providing a group of elements or services." See 47 C.F.R.S 51.505(c)(1). Third, the sum of TELRIC and a reasonable allocation of forward-looking common costs "shall not exceed the stand-alone costs associated with the element." See 47 C.F.R. S 51.505(c)(2).

The Eighth Circuit struck down the FCC's TELRIC methodology, holding that S 51.505(b)(1) was inconsistent with the statutory language, in that it based prices on what the cost would be of particular elements if the ILEC provided the most efficient technology in the most efficient configuration of a hypothetical efficient network, rather than the actual cost of providing the elements of the actual, existing network. See Iowa Utils. II, 219 F.3d at 750; id. (stating that Congress did not intend rates to be based on the cost some imaginary ILEC would incur, but on the actual costs that ILECs incurred in sharing network elements). The Eighth Circuit did hold that a forward-looking pricing methodology, if based on actual incremental costs incurred or that will be incurred by an ILEC, would produce a price consistent with the Act. See id. at 752-53. The court also rejected the argument that cost under S 252(d)(1)(A) must mean historical costs. See id. at 751. The Supreme Court granted certiorari on these issues, see FCC v. Iowa Utils. Bd., 121 S. Ct. 878 (2001), leaving undecided the question of whether prices can be based on a hypothetical efficient network configuration until the Supreme Court determines the validity of the FCC regulations during its next term.

The FCC explained the terms TSLRIC and TELRIC. Under TSLRIC, "total service" refers to the entire quantity of the service (either single service or a class of similar services) that a firm produces, along with the costs of dedicated facilities and operations used in providing that service. See Local Competition Order P 677. The FCC coined and adopted

44

the term TELRIC in the Local Competition Order to describe a different version of that methodology, one based on the specific network element or elements to be priced. See id. P 678. Essentially, TELRIC appears to be an unbundled version of TSLRIC methodology, pricing discrete network elements rather than entire services. The PUC and Verizon argued that the required TELRIC methodology was a version of TSLRIC and that the PUC's pricing model was proper.

The PUC set prices based on what it labeled a TSLRIC methodology.[9] But in reviewing that decision, the District Court did not look any further than the acronym applied by the PUC to determine whether, in fact, the PUC based prices on the forward-looking costs of discrete network elements. The record suggests that the PUC attempted to use a forward-looking, element-based methodology and believed that it had done so. The labels that the PUC used apparently confused the issue.

The PUC's use of the TSLRIC acronym without more, however, does not provide a basis for vacating the pricing decision. The District Court never reviewed the substance of the pricing standard, never considered whether the inputs that the PUC used in setting prices (based on the pricing model offered by Verizon) were proper or whether the prices it established were consistent with the Act. This determination is primarily a factual issue, subject to substantial evidence review, that must be performed by the District Court in the first instance.

We will remand this issue to the District Court with instructions to review the substance and merits of the PUC methodology and its pricing decision and, with the guidance of the Supreme Court's expected ruling on the validity of the FCC regulations, to determine whether the prices for unbundled network elements established in the interconnection agreement comport with the Act.

_____

9. See A-1378 ("[W]e adopted the use of TSLRIC as the appropriate cost methodology to set prices for unbundled elements.")

Conclusion

For the foregoing reasons, we will affirm the District Court's denial of the PUC's and Commissioners' claims of Eleventh Amendment sovereign immunity. As to the terms of the interconnection agreement, we will reverse the District Court's decision with respect to the wholesale rates set by the PUC and the pricing of unbundled network elements; we will affirm the District Court in all other respects. We remand this case to the District Court for further proceedings consistent with this opinion.

46

AMBRO, Circuit Judge, concurring in part and dissenting in part:

Judge Roth has written an exceptional opinion for the Court. I agree with its reasoning and conclusion that the Commonwealth has waived its sovereign immunity by regulating local telephone service in Pennsylvania within the confines of the Telecommunications Act of 1996. Nonetheless, I write separately to emphasize that our holding, and indeed the holdings of the many courts of appeals that have taken the same position, is a novel one and should be so recognized. I also write separately to dissent from the Court's holding that the collocation of remote switching modules can be required under the 1996 Act.

A.

We hold today that the 1996 Telecommunications Act fits within the narrow exception for "gratuity waivers" discussed in College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, 527 U.S. 666, 686–87 (1999). The "gratuity waiver" is an exception from the general rule, set forth in College Savings Bank, that no constructive waiver of sovereign immunity can be inferred from a state's involvement in an area subject to federal regulation. See id. at 686. There is reason to argue, however, that we are expanding the scope of the "gratuity waiver" exception beyond the examples given in College Savings Bank.

In discussing the general rule that there can be no "constructive waiver" of Eleventh Amendment immunity, and the resultant overruling of Parden v. Terminal R. of Alabama Docks Dept., 377 U.S. 184 (1964), the Supreme Court emphasized that effective waivers of sovereign immunity, like other constitutional rights, must involve the "intentional relinquishment or abandonment of a known right or privilege." College Sav. Bank, 527 U.S. at 682 (citing Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). Requiring a state to possess knowledge of its immunity and to intend to waive that immunity imparts upon the state a requirement of volition -- it must wish to waive its immunity.

47

Moreover, the Court in College Savings Bank noted one other component of effective waiver; it requires a" `clear declaration' by the State of its waiver . . . to be certain that the State in fact consents to suit." Id. at 680 (emphasis in original). This expression of intentional relinquishment must be unequivocal. Id. That is, not only must the waiver be clear, but the state cannot equivocate in expressing its intent. Under these standards, it is the rare case that a federal court would find the waiver of sovereign immunity.

Despite the Supreme Court's invocation of these two hallmarks of effective sovereign immunity waiver-- intention and clarity of expression -- it left a vestige of constructive waiver in those situations in which the waiver is exacted as a condition to the state's acceptance of Congress's gratuity. College Sav. Bank at 686-87. The Court cited two cases in support of the concept of"gratuity waiver," Petty v. Tennessee-Missouri Bridge Comm'n, 359 U.S. 275 (1959), and South Dakota v. Dole, 483 U.S. 203 (1987). In Petty, Congress approved a bistate commission created by an interstate compact containing a clause allowing suit. Petty, 359 U.S. at 277-78. The Court in College Savings Bank concluded that because states were barred from forming such compacts by the Constitution, Congress's consent to a compact was a gratuity in that it granted powers to a state entity previously denied to it. More importantly for our purposes, the Supreme Court held that this gratuity -- the approval of an interstate compact -- could be conditioned on the waiver of sovereign immunity and that courts could infer waiver from the state's acceptance of that gratuity. College Sav. Bank, 527 U.S. at 686. Similarly, in South Dakota v. Dole , states received funding from the federal government conditioned on each state's acceptance of a uniform drinking age. 483 U.S. at 205. In both cases, Congress lacked the power to abrogate the states' sovereign immunity (in Petty) or require a mandatory drinking age (in Dole), but Congress's grant of a gratuity permitted it to require as a condition of the gift the very waiver or action it could not accomplish in its own right. College Sav. Bank, 527 U.S. at 686.

Notably, in both cases cited in College Savings Bank, it was entirely clear to the state from the face of the statute

48

itself that it was agreeing to Congress's condition. For example, in Petty, Congress "approved a sue-and-be-sued clause in a compact under conditions that make it clear that the States accepting it waived any immunity from suit which they otherwise might have." Petty, 359 U.S. at 280. Similarly, the statute at issue in Dole so clearly exacted a condition on the grant of highway funds that the State of South Dakota itself sued to establish its unconstitutionality. Dole, 483 U.S. at 205. Thus, we can assume that for "gratuity waivers" the clarity the Court demanded in College Savings Bank, for the state's expression of waiver has simply shifted sources. Rather than requiring a " `clear declaration' by the State," College Sav. Bank, 527 U.S. at 680, we now require a clear declaration from Congress that, by accepting the gratuity, the states will forfeit whatever rights Congress chooses to attach as a condition.1 See Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 247 (1985) (finding an act of Congress does not clearly evince its intention to require states receiving funds to waive their sovereign immunity).

This requirement of clarity on Congress's part is a necessary component of inferring from a state's actions its decision to waive its sovereign immunity. Congress's clarity of expression and the resulting action by the state substitute for the state's own expression of waiver. It is in satisfaction of this requirement of a "constructive waiver" that the courts of appeals have concluded that the 1996 Telecommunications Act clearly expresses Congress's intention to attach a condition to its gratuity of regulatory authority over local telephone service. See Maj. Opinion at 23-24 (listing cases); but see Bell Atlantic Maryland, Inc. v. MCI Worldcom, Inc., 240 F.3d 279, 293 (4th Cir. 2001) ("[a] State official reading this provision would have no indication that the State commission, if it chose to make the reviewable determination, would be compelled to appear

_____

1. This mirrors the requirement that Congress's abrogation of sovereign immunity be clear and unequivocal. See Quern v. Jordan, 440 U.S. 332, 343-44 (1979). Of course, abrogation and waiver are closely related. "Forced waiver and abrogation are not even different sides of the same coin--they are the same side of the same coin." College Sav. Bank, 527 U.S. at 683.

in federal court at the behest of an aggrieved telecommunications company").

Clarity, however, is only half of the requirements of effective waiver. As noted above, the Supreme Court emphasized in College Savings Bank that a waiver of sovereign immunity must also be "intentional." 527 U.S. at 682. The "gratuity waiver" of the Commonwealth that we approve today lacks on its face any indicia of being intentional. The Pennsylvania Utility Commission has steadfastly maintained that it did not intend to waive its immunity from suit and that its arbitration and approval of the interconnection agreement was an action taken pursuant to state law, not the 1996 Act. Of course, we recognized in the majority opinion that the 1996 Act federalized the provision of local telephone services and therefore rejected the PUC's reliance on state authority. See Majority Op. at 26-27; AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 378 n.6 (1999) ("With regard to the matters addressed by the 1996 Act, [Congress has] unquestionably [taken the regulation of local telecommunications competition away from the States]").

Nonetheless, the PUC's reliance on state law is interesting for another reason. Unlike Petty and Dole, the PUC has not made any affirmative manifestation of its acceptance of Congress's gratuity, such as the new operation of a bistate commission or acceptance of federal highway funds. Instead, it has merely continued what it has always done -- regulate local telephone service for Pennsylvanians. When Congress has taken away the PUC's authority with one hand and returned it (albeit in a new framework) with the other, it is difficult to understand what it is that the PUC has to do to manifest its acceding to Congress's condition that it waive sovereign immunity. Indeed, we have no indication here that Pennsylvania intended to waive its sovereign immunity at all, 2 other than

_____

2. This stands in stark contrast to states such as Delaware, for example, which has authorized its utility commission to act pursuant to the 1996 Act. See Bell Atlantic-Delaware v. McMahon, 80 F. Supp. 2d 218, 232 (D. Del. 2000); 26 Del. Code S 703(4) (1998). While the Delaware General Assembly did not expressly waive its sovereign immunity by this statute, it is evidence that the State intended to accept the benefit of regulating under its mandate. See Bell Atlantic-Delaware , 80 F. Supp. 2d at 232 n.10.

50

its continued presence in a field of regulation in which it has operated for the better portion of the twentieth century.

Thus, our case stands for the proposition that a"gratuity waiver" can exist even without conduct expressly accepting that gratuity, if Congress is sufficiently clear in structuring its condition. It is not simply that Congress has said that states will waive their sovereign immunity if they accept the new authority. Congress has said that if states continue to act as they have, they will waive their sovereign immunity, and thus has mandated that the states take action if they do not wish to waive their immunity. Conversely, the affirmative act indicating an intention to accept the gratuity is not the simple acceptance of new money or new authority, it is the failure to refuse the grant of an authority previously possessed.3

Because I believe that questions of the constitutional viability of "cooperative federalism" will repeat themselves as long as Congress continues to fashion such creative regulatory regimes, we should acknowledge this novelty. See College Sav. Bank, 537 U.S. at 702-03 (Breyer, J., dissenting) (discussing the need for legislative flexibility to foster national uniformity in regulation while preserving local control). With as yet no Supreme Court determination with respect to the issue before us, I believe that the efficacy of "cooperative federalism" requires our Court's flexibility in this instance.

_____

3. If we recognize that the constructive waiver in this case is inferred based on a state's continuing regulation of telecommunications, and not any affirmative acceptance of the 1996 Act, one might conclude that Congress has skirted dangerously close to creating a sanction and not the grant of a gratuity. The Court in College Savings Bank suggested a distinction between a condition placed on a gift and a sanction--the former being an acceptable means of securing the waiver of sovereign immunity from a state and the latter not. College Sav. Bank, 527 U.S. at 687. A sanction exists if Congress excludes "the State from otherwise permissible activity." Id. As the majority correctly notes, because the 1996 Act removes local telephone regulation from the states and because doing so is wholly lawful, see Hodel v. Virgina Surface Mining and Reclamation Ass'n, 452 U.S. 264, 290 (1981), it is not a sanction. Maj. Op. at 26-27. Thus, while Pennsylvania has waived its sovereign immunity without an affirmative expression of its acceptance of a gratuity, it is nevertheless a gratuity that it has received.

B.

I also respectfully dissent from the majority's interpretation of collocation requirements of the 1996 Telecommunications Act. The Act forces ILECs "to provide, on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, for physical collocation of equipment necessary for interconnection or access to unbundled network elements at the premises of the local exchange carrier." 47 U.S.C. S 251(c)(6) (emphasis added).

The majority affirms the District Court's order affirming the PUC's determination that Worldcom be permitted to collocate remote switching modules in Verizon's offices. Instead, I would adopt the position that locating remote switching modules in the central offices of an ILEC (Verizon) is not "necessary to interconnect" to the ILEC's network. 47 U.S.C. S 251(c)(6); see GTE Serv. Corp. v. FCC, 205 F.3d 416, 423–24 (D.C. Cir. 2000) (FCC regulations permitting collocation of remote switching modules exceeds the reach of S 251(c)(6) by interpreting "necessary" to mean efficient or useful).

While the majority correctly notes that the FCC has promulgated new regulations in response to the D.C. Circuit's ruling in GTE Serv. Corp., those regulations continue to permit the collocation of remote switching modules without regard for Congress's express limitations in S 251(c)(6) to those devices "necessary" to interconnect. The majority's reasoning is plausible. Yet it has substituted its responsibility to interpret what "necessary" means with broad policy statements regarding what it believes to be the most efficient means of accomplishing collocation. Assuming the remote switching devices result in certain efficiencies, they are not necessary for interconnection of CLECs to the ILEC's network. Because I would adopt the position of the D.C. Circuit that the term "necessary" constrains the authority of the PUC to mandate collocation of devices that do more than provide the essential interconnection required by the Telecommunications Act, I respectfully dissent.

52

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit